**2023-1176, 2023-1177**

# United States Court of Appeals for the Federal Circuit

DDR HOLDINGS, LLC,

*Plaintiff-Appellant,*

— v. —

PRICELINE.COM LLC, BOOKING.COM B.V.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Delaware, Cases Nos. 1-17-cv-00498 and -00499, Chief Judge Colm F. Connolly

## CORRECTED BRIEF FOR APPELLANT DDR HOLDINGS, LLC

IAN B. CROSBY
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
icrosby@susmangodfrey.com

LOUIS J. HOFFMAN
HOFFMAN PATENT FIRM
7689 East Paradise Lane, Suite 2
Scottsdale, Arizona 85260
Telephone: (480) 948-3295
louis@valuablepatents.com

SHAWN D. BLACKBURN
MENG XI
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 653-7822
Telephone: (713) 653-7851
sblackburn@susmangodfrey.com
mxi@susmangodfrey.com

*Attorneys for Appellant*

FEBRUARY 7, 2023

U.S. Patent No. 7,818,399 claim 1:

1.     A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:

(a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has been activated;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other;

(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then

(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:

(i) information associated with the commerce object associated with the link that has been activated, and

(ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1176, 2023-1177

**Short Case Caption** DDR Holdings, LLC v. Priceline.com LLC, Booking.com B.V.

**Filing Party/Entity** DDR Holdings, LLC

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/06/2022

Signature:

Name: Ian B. Crosby

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| DDR Holdings, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| J. Craig Smyser, Susman Godfrey LLP | Rosemary J. Piergiovanni, Farnan LLP | |
| Edward J. Delman, Susman Godfrey LLP | Brian E. Farnan, Farnan LLP | |
| Michael Farnan, Farnan LLP | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Contents

I.    STATEMENT OF RELATED CASES ............................................. 1

II.    STATEMENT OF JURISDICTION ................................................. 1

III.    STATEMENT OF THE ISSUES ..................................................... 2

IV.    STATEMENT OF THE CASE ......................................................... 2

    A.    Statement of the Facts ................................................... 4

        1.    DDR's patented system ...................................... 4

        2.    DDR's suit against Priceline and Booking .................. 7

V.    SUMMARY OF THE ARGUMENT ................................................. 8

VI.    ARGUMENT ................................................................................ 10

    A.    Standard of Review ...................................................... 10

    B.    This Court "must respect" the patentee's "lexicographic choice" to define "merchants" as purveyors of "products *or services.*" ............................................................. 11

    C.    DDR never disclaimed the '399 patent's definition of "merchants" ........................................................... 13

    D.    The regular application does not exclude incorporated material or supersede the definition of "merchant" in the provisional application ................................................ 16

    E.    The preferred embodiment described in the published specification does not clearly exclude services. .................... 19

    F.    Extrinsic evidence cannot overcome the patentee's express lexicography. ...........................................................23

G.      The term "commerce object" should be interpreted
        consistently with the term "merchants" and held to
        likewise include services. ......................................................25

VII.  CONCLUSION ................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.,*
212 F.3d 1272 (Fed. Cir. 2000) ........................................ 12, 16, 17, 19

*Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.,*
674 F.3d 1365 (Fed. Cir. 2012) ........................................... 11

*Allergan Sales, LLC v. Sandoz, Inc.,*
935 F.3d 1370 (Fed. Cir. 2019) ........................................... 11

*Biogen MA Inc. v. EMD Serono, Inc.,*
976 F.3d 1326 (Fed. Cir. 2020) ....................................... 12, 13

*CCS Fitness, Inc. v. Brunswick Corp.,*
288 F.3d 1359 (Fed. Cir. 2002) ........................................... 14

*DDR Holdings, LLC v. Hotels.com, L.P.,*
773 F.3d 1245 (Fed. Cir. 2014) ............................................. 6

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC,*
918 F.3d 928 (Fed. Cir. 2019) ............................................ 10

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
175 F.3d 985 (Fed. Cir. 1999) ............................................ 16

*MPHJ Technology Investments, LLC v. Ricoh Americas
Corporation,*
847 F.3d 1363 (Fed. Cir. 2017) ...................................... 17, 18

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .............................. 13, 24, 27

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n,*
511 F.3d 1132 (Fed. Cir. 2007) ........................................... 15

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,*
844 F.3d 1370 (Fed. Cir. 2017) ........................................... 11

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................... 16, 20

*Trustees of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ................................................. *passim*

## Statutes

28 U.S.C. § 1295(a)(1) ................................................................... 2

28 U.S.C. §§ 1331 and 1338 ........................................................ 2

## Other Authorities

*Electronic Commerce Environments: Corporate Obstacles and
    Opportunities to Competitiveness*, Chris Vestal, Aug. 1,
    1999 ............................................................................................. 25

*InfoHaus Seller's Guide*, May 1, 1996, .................................... 25

"The Opportunity: Affiliate Networks: A Revolution in
    Retail," *beFree*, May 1998 ................................................. 25

Random House Compact Unabridged Dictionary (2d ed.
    1996) ........................................................................................... 23

U.S. Patent No. 6,330,575 ........................................................ 25

U.S. Patent No. 7,818,399 ............................................. *passim*

Webster's New Universal Unabridged Dictionary (1996) ...................... 23

## I.    STATEMENT OF RELATED CASES

DDR Holdings LLC ("DDR Holdings") appeals the ruling of the United States District Court for the District of Delaware, Chief Judge Colm F. Connolly, granting the parties' Joint Stipulation of Non-Infringement and Motion for Entry of Final Judgment and entering Final Judgment against DDR Holdings in the consolidated cases *DDR Holdings, LLC v. Priceline.com, LLC,* 17-cv-498 (D. Del.) (lead case) and *DDR Holdings, LLC v. Booking.com, B.V.*, 17-cv-499 (D. Del.) (consolidated case). Appx0001–0002.

No other appeal has been taken from these civil actions. DDR Holdings is unaware of any other related appeal or other case that may directly affect or be directly affected by this appeal.

## II.    STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338 over these actions for patent infringement. The District Court granted final judgment in favor of Defendants-Appellees Priceline and Booking on November 4, 2022. Appx0001–0002. Plaintiff-Appellant DDR Holdings timely appealed on November 14, 2022. Appx1613–1615.

## III.  STATEMENT OF THE ISSUES

Did the district court err in construing the claim term "merchants" to be limited to purveyors of goods alone based on its understanding of features of a preferred embodiment viewed in light of general-purpose dictionary definitions, when an express definition in a provisional application that the patentee incorporated by reference stated that the term includes purveyors of *both* goods *and* services?

## IV.  STATEMENT OF THE CASE

This case comes before the Court on appeal from a stipulated final judgment of non-infringement following an order on claim construction entered in the District of Delaware. The patent in suit is U.S. Patent No. 7,818,399, "Methods of Expanding Commercial Opportunities for Internet Websites Through Coordinated Offsite Marketing" ("'399 patent"). Representative claim 1 of the '399 patent recites:

> 1. A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:
>
> > (a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has been activated;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other;

(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then

(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:

(i) information associated with the commerce object associated with the link that has been activated, and

(ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

The patentee DDR Holdings accuses the defendants Priceline.com and Booking.com of infringing the '399 patent through the operation of websites that sell travel services on behalf of third-party providers, which DDR alleges are the "merchants" recited in the claims. Appx0044. The district court construed the term "merchants" to mean "producers, distributors, or resellers of the goods to be sold." Appx0004–

0005. It rejected DDR's proposed construction, which would have included purveyors of "services" within the scope of that term, along with DDR's proposed construction of the related term "commerce object" to include services as well. Appx1288–1291. Because these constructions limited the scope of the claims to commerce in goods, DDR stipulated to judgment on grounds of non-infringement and brought this appeal. *See* Appx0001–0005.

## A.    Statement of the Facts

### 1.    *DDR's patented system*

The '399 patent arose out of the development of a platform called Nexchange[1] that sought, according to the patent's incorporated provisional application, to provide an "alternative approach" to requiring "the average producer of a good or service" to develop "a new competency in Internet marketing" to sell online in the early days of e-commerce. Appx0868. Traditional "affiliate programs" allowed website owners to provide links on their web sites to products sold by others and collect a commission when visitors clicked through to make a purchase

---

[1] Nexchange was an operating company that employed several hundred people and had some success but folded in the "dot com crash" at the turn of the century. Appx0044–0045.

"without requiring an investment in product inventory or additional infrastructure." Appx0538 (2:24-27).[2] But the inventors understood that this model provided insufficient benefit to the referring affiliate site because "Amazon.com and other online stores" use such programs to "lure the visitor traffic away from the affiliate." *Id.* (2:29–33).

To address this problem, the inventors conceived a system in which an "outsource provider" served an e-commerce website whose appearance could correspond to the "look and feel" of the web site of a referring "host" in response to the activation of links to buying opportunities or "commerce objects" of "merchants." *E.g.,* Appx0539 (3:1–34).

Defining the latter term, the incorporated provisional application states:

> "Merchants, defined as producers, manufacturers, and select distributors of products or services are strongly attracted to the sales potential of the Internet."

Appx0876.

Under the described model, "Merchants outsource [e-commerce] functions to Nexchange at far lower cost," which "enables Merchants to

---

[2] Unless otherwise indicated, column:line numbers cite to the specification of the '399 patent.

focus on their core competencies—product/service design, production,

and fulfillment." *Id.* Referring host sites are similarly relieved of the re-

quirement to develop e-commerce capabilities without having to "relin-

quish" their customer relationship to the merchant. Appx0878.

This Court has previously summarized the invention of the '399

Patent:

> In particular, the '399 patent's claims address the problem of
> retaining website visitors that, if adhering to the routine, con-
> ventional functioning of Internet hyperlink protocol, would be
> instantly transported away from a host's website after "click-
> ing" on an advertisement and activating a hyperlink . . . In
> more plain language, upon the click of an advertisement for a
> third-party product displayed on a host's website, the visitor
> is no longer transported to the third party's website. Instead,
> the patent claims call for an "outsource provider" having a
> web server which directs the visitor to an automatically-gen-
> erated hybrid web page that combines visual "look and feel"
> elements from the host website and product information from
> the third-party merchant's website related to the clicked ad-
> vertisement. In this way, rather than instantly losing visitors
> to the third-party's website, the host website can instead send
> its visitors to a web page on the outsource provider's server
> that 1) incorporates "look and feel" elements from the host
> website, and 2) provides visitors with the opportunity to pur-
> chase products from the third-party merchant without actu-
> ally entering that merchant's website.

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed.

Cir. 2014).

## 2.     *DDR's suit against Priceline and Booking*

DDR Holdings, an entity owned by several of the inventors, acquired from Nexchange an unexamined parent application describing the invention and ultimately prosecuted and obtained the '399 patent. Appx0044–0045. DDR filed suit in 2017 against Priceline and Booking asserting infringement of the '399 patent. *See* Appx0044; Appx0246. The case was stayed pending institution of an ultimately unsuccessful IPR in which the PTAB found all of the challenged claims of the '399 patent not unpatentable. *See* Appx0686–0736. Petitioners did not appeal.

During the IPR, the PTAB rejected a contention by Priceline and Booking that the construction of "merchants" should be limited to "producers, distributors, or resellers of the goods to be sold through the outsource provider." Appx0748. After the IPR, Priceline and Booking re-raised and prevailed on this construction before the district court. Appx0009.

The district court did not set out its reasoning for adopting this construction in a written order. In remarks on the record at the claim construction hearing, it found that there is "no reference to services" in the claim language or "to a merchant providing a service" in the written

description. Appx1418–1419. It concluded that "if anything," the provisional patent specification "indicate[d]" that "products or services" in "are two distinct things" merchants purvey and "cuts against the plaintiff's position" in view of the frequent references to "products" in the published patent specification. Appx1420–1421.

The district court construed the lack of reference to merchants providing services in the published specification as "a deletion from the written description of a term that was in the provisional application" notwithstanding the incorporation by reference of the provisional in the as-filed regular application. Appx1421. The district court also found "compelling … numerous definitions from dictionaries" that it summarized as stating "merchants sell goods." Appx1421–1422. It concluded that it had "effectively construed" the related term "commerce object" to be limited to goods as well in having construed "merchants" this way. Appx1424.

## V.    SUMMARY OF THE ARGUMENT

The provisional '399 patent application contains an express definition of "merchants." This definition includes "services." The patentee never superseded or disclaimed this definition in the subsequent

prosecution history. To the contrary, the patentee expressly incorporated it by reference in the issued patent specification. This Court consistently respects a patentee's choice to act as his own lexicographer. It was error for the district court to ignore the patentee's express definition of "merchants" and limit the scope of that term to purveyors of goods only.

Instead, the district court improperly limited the claims to a preferred embodiment that it understood as pertaining to goods alone. Its reading of the description of this embodiment as effecting a "deletion" of services from the written description contradicts the patentee's incorporation of the provisional application and its express definition in the filed patent specification. Even if the specification of the regular application (excluding incorporated material) described commerce in goods alone, the incorporated teaching of merchants providing services in the provisional application shows that either is a potential embodiment of the invention.

The district court provided no independent rationale for its similarly limited interpretation of the term "commerce object." All agreed below that this term should be construed consistently with the term

"merchants." Because the merchants of the claims are expressly defined to include purveyors of both goods and services, the objects of the commerce that the claims facilitate should include both goods and services as well.

## VI.   ARGUMENT

The district court's construction requiring "merchants" to be purveyors of only "goods" should be reversed because it contradicts an express definition of that term in the patent specification that was never disclaimed. The related term "commerce object" should also be construed consistently with that definition.

### A.    Standard of Review

"Claim construction is ultimately a question of law that this court reviews *de novo*." *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016). "The construction of claim terms based on the claim language, the specification, and the prosecution history are legal determinations." *Id.* Thus this Court "review[s] a district court's ultimate claim construction and its interpretations of intrinsic evidence de novo," but only reviews "subsidiary fact findings about extrinsic

evidence for clear error." *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 932–33 (Fed. Cir. 2019).

"To trigger clear error review, 'it is not enough that the district court may have heard extrinsic evidence during a claim construction proceeding—rather, the district court must have actually made a factual finding'" based on such evidence. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (quoting *Cardsoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1350 (Fed. Cir. 2015)). Clear error review does not apply where "extrinsic evidence was not necessary for consideration" of the ultimate issue. *Id.* (internal quotation marks and alteration omitted). "Where … the intrinsic evidence alone determines the proper claim construction, [this Court] review[s] the district court's ultimate legal conclusion de novo." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019).

## B. This Court "must respect" the patentee's "lexicographic choice" to define "merchants" as purveyors of "products *or services*."

"'If [a] patentee [has] acted as his own lexicographer and clearly set forth a definition of [a] disputed claim term in either the specification or prosecution history,' then that definition *governs*." *Advanced*

*Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)) (emphasis added). Where a patentee has provided an "explicit definition … in the specification," this Court has held that it "*must* respect this lexicographic choice." *Biogen MA Inc. v. EMD Serono, Inc.*, 976 F.3d 1326, 1336 (Fed. Cir. 2020) (emphasis added).

Here, the patentee has made a "lexicographic choice" to provide an "explicit definition," *id.*, of the term "merchants" that includes purveyors of both goods and "services," in *both* the file history *and* the specification of the '399 patent, *see* Appx0748; Appx0876. In the file history, the provisional application for the '399 patent expressly states that "Merchants" are "*defined as* producers, manufacturers, and select distributers of products *or services.*" Appx0876 (emphasis added). The patentee further made this express definition an "explicit" part of the specification of the '399 patent by incorporating the provisional application by reference. *See* Appx0538 (1:9–15); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (holding that provisional applications incorporated by reference are "effectively part

of the" specification as though it was "explicitly contained therein."); *see Trustees of Columbia Univ.*, 811 F.3d at 1365–66 (construing claims using definition in a provisional application incorporated by reference).

This Court need look no further than this "special definition given to a claim term by the patentee" in both the file history and patent specification to decide this case. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*). Here, the patentee has *explicitly defined* "merchants" as purveyors of "products *or services*." Appx0876. "In such cases, the inventor's lexicography *governs*." *Id.* (emphasis added).

## C.    DDR never disclaimed the '399 patent's definition of "merchants"

This Court has never recognized any exception to the *en banc Phillips* rule that a patentee's explicit lexicography governs the construction of a disputed claim term. *See id.* In repeatedly holding that it "*must respect*" such a "lexicographic choice" this Court has instead rejected the possibility of such an exception. *Biogen*, 976 F.3d at 1336 (emphasis added).

This Court *has* held that "a claim term will not carry its *ordinary meaning* if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment,

expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS*, 288 F.3d at 1366. But it *has never* held that such evidence can abrogate a *special meaning* ascribed to a claimed term by a patentee through express lexicography, much less that such an *explicit* definition could be disclaimed *implicitly*.

Regardless, none of the grounds that this Court has recognized for limiting even the ordinary meaning of a claim term are present here. The patentee has never sought to distinguish prior art on the ground that the merchants of the claims are limited to purveyors of goods. To the contrary, when appellees brought an unsuccessful *Inter Partes* Review proceeding against the '399 patent, they proposed, the patentee opposed, and the PTAB rejected, a construction limiting "merchants" to purveyors of "goods" alone. Appx0748.

The PTAB considered a sentence in a description of a preferred embodiment stating: "Merchants are the producers, distributors, or re-sellers of the goods to be sold." Appx0748–0749. In contrast with the statement incorporated by reference from the provisional application ("Merchants, defined as producers, manufacturers, and select distributors of products or services ...." *see* Appx0876), this sentence does not

contain the phrase "defined as" or any other words suggesting that it is setting forth a definition, *see* Appx0548 (22:17–19). Finding that the reference to merchants as "resellers of … goods" was not "definitional," the PTAB concluded that the patentee had not "depart[ed] from the ordinary meaning of the term with 'reasonable clarity, deliberateness, and precision.'" Appx0748 (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

The district court did not disagree; it did not make any finding or holding that this sentence was "definitional" either. To the contrary, the district court acknowledged that "under Federal Circuit case law, lexicography requires a clear and explicit statement by the patentee." Appx1416 (citing *Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd.*, 887 F.3d 1153, 1159 (Fed. Cir. 2018)).

The PTAB was right. The reference to merchants as purveyors of goods, for example, does not "set off ['merchants'] by quotation marks [to] indicat[e] that what follows is a definition" in lieu of an express statement to that effect like the one in the provisional application. *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). It occurs instead in the context of a long discussion in

which "[a] preferred embodiment of the invention is now described in detail." Appx0539 (4:38–39). As this Court has held, "mere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 992 (Fed. Cir. 1999).

The standards for lexicography and disclaimer are equally exacting: "Both require a clear and explicit statement by the patentee." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1367–68 (Fed. Cir. 2012). The express definition of "merchants" to include purveyors of "services" in the incorporated provisional specification is just such a "clear and explicit" statement. *Id.* The reference to merchants as resellers of goods of the '399 patent in connection with a preferred embodiment is not.

## D. The regular application does not exclude incorporated material or supersede the definition of "merchant" in the provisional application.

There is no contradiction between the specification of the patent as published and the express definition of "merchant" in the incorporated provisional application that includes purveyors of services. There can't be. That definition is *part* of the as-issued regular application's

specification. *See Advanced Display Sys.*, 212 F.3d at 1282. The patentee submitted the written description that appears on the face of the published patent and incorporated the provisional patent application by reference at the same time. Together they form one document. Neither supersedes or amends its counterpart. Any asserted inconsistency between them must be reconciled, not resolved in favor of one or the other. *See id.*; *Trustees of Columbia Univ.*, 811 F.3d at 1365–66.

This Court did not decide otherwise in *MPHJ Technology Investments, LLC v. Ricoh Americas Corporation*, 847 F.3d 1363 (Fed. Cir. 2017). In *MPHJ*, the patentee filed a provisional application that described an embodiment of the invention performing a copying operation in a single step. *Id.* at 1368. The published specification not only lacked description of a single-step embodiment but also included new language that "describe[d] the single-step operation as 'optional.'" *Id.* at 1369. Affirming the PTAB's finding of invalidity over art that taught multiple steps, this Court concluded that "[a] person skilled in this field would reasonably conclude that the inventor intended that single-step operation would be optional, not obligatory" in view of this history. *Id.*

*MPHJ* bears no resemblance to this case. The provisional application at issue in *MPHJ* did not contain an express definition of a claim term that addressed the single-step operation. *See id.* at 1367–69. Nor did the case pose the question whether the published specification *disclaimed* the scope of the provisional. Rather, the question presented was whether the complete filed specification, including the incorporated provisional, *broadened* the scope of the provisional specification by adding an alternative embodiment, thereby expressly making an asserted limitation of the provisional optional. *See id.* Applying the "broadest reasonable interpretation" standard applicable in that case, this Court found that it did. *See id.* at 1364.

It does not follow from *MPHJ* that the asserted omission of "services" from a description of *one* preferred embodiment in the published patent specification negates the express definition of "merchants" as including purveyors of "services" in the provisional that was incorporated in the application as filed. *See* Appx0538–0539 (1:9–15, 4:38–39). To the contrary, the disclosure of embodiments in the incorporated provisional in which merchants provide services alongside an embodiment in the published specification in which they provide goods would imply,

according to the logic of *MPHJ*, that *either* embodiment falls within the scope of the claims.

The file history confirms that the as-filed regular application did not supersede the provisional application—indeed, on this very issue. In the parent application, the patentee applied for and obtained two patent claims using the term "products or services" taken from the provisional application. *See* Appx0847; Appx0851. In the file history of the application that issued as the '399 patent, DDR referred to the parent claims as including services. Appx0779. Not only does this reference confirm that the provisional application's definition of what merchants could sell was not superseded, but also that services were not excluded from the scope of the specification.

### E.    The preferred embodiment described in the published specification does not clearly exclude services.

The district court justified its restrictive construction of "merchants" principally by reference to its conclusion that in "the written description … there are … no references to a merchant providing a service." Appx1418–1419. This conclusion is obviously incorrect because it is settled law that the provisional application is as much part of the '399 patent's written description as the published patent specification.

*See Advanced Display Sys.*, 212 F.3d at 1282. The incorporated provisional application, and therefore the written description itself, contains many references to providing services. *See, e.g.*, Appx0876 ("Nexchange enables Merchants to focus on their core competencies—product/service design, production, and fulfillment ...."); Appx0868 (addressing "value of Nexchange" to "producer of a good or service"); Appx0870 (discussing "Nexchange Merchants" under heading "Products and Services").

Even if the district court were correct to limit the "written description" to the as-filed regular application's text, the district court's conclusion that the "written description" does not describe "merchants" providing "services" would not justify construing the term restrictively. The preferred embodiment described in the published specification simply does not evidence a clear intent to limit the term. *See, e.g.*, *Thorner*, 669 F.3d at 1365 ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

The district court grounded its conclusion on its "finding as a matter of fact that the written description treats 'goods' and 'product' interchangeably, and it distinguished them [from] 'services.'" Appx1358. Notwithstanding the district court's characterization of this finding as a factual finding, its reading of the patent specification is a legal determination that this Court reviews *de novo*. *See Trs. of Columbia Univ.*, 811 F.3d at 1362. Either way, that determination is in error.

*First*, the district court's conclusion that the written description uses "products" interchangeably with "goods" is inconsistent with examples given in the published specification. The previously discussed non-definitional reference to merchants in the description of a preferred embodiment contains the only reference to "goods" in the published written description of the invention. *See* Appx0548 (22:17–19).[3] Everywhere else, the published specification refers to subject matter sold using the invention as "products."

Nowhere does the published specification expressly equate "products" with "goods." In some instances, the published specification refers

---

[3] A second reference to goods occurs in the description of the prior art under the heading "Background of the Invention." Appx0538 (2:16–20).

to products in contexts such as inventory that pertain to physical goods. *See, e.g.*, *id.* (21:36–37). But it also refers to omitting features, namely shipping, that would be required for the sale of physical goods. *See* Appx0540 (6:56–57) ("Shipping Option" includes "NA"). The district court's conclusion that the written description uses "products" interchangeably with "goods" does not account for all examples in the published specification, much less the examples explicitly referring to merchants selling "services" incorporated by reference from the provisional.

*Second*, the district court's conclusion that the written description distinguishes "products" from "services" has no basis in the published specification, which never juxtaposes those terms. For this, the district court emphasized the reference to "products or services" in the provisional application. Appx1420–1421 ("[U]se of the disjunction, if anything, it indicates that these are two distinct things."). But this reference occurs in the very definition of the term "merchants" that the district court declined to adopt! *See* Appx0876. It is unreasonable to infer that the patentee intended to withdraw a definition of merchants that includes purveyors of "products *or* services" based on the use of

that phrase in the definition itself. To the contrary, the plain effect of this disjunction in the definition of "merchants" is to *broaden* the scope of that term to include purveyors of either or both.

### F. Extrinsic evidence cannot overcome the patentee's express lexicography.

The district court acknowledged that its subsidiary construction of the term "products" as equivalent to "goods" for purposes of interpreting the patent's written description was at odds with extrinsic evidence. *See* Appx1421 ("I think there is no question 'products' in certain contexts can have a meaning that could possibly include services."). It could not have concluded otherwise in view of the evidence DDR presented. *See* Appx0888–0890 (Webster's New Universal Unabridged Dictionary at 1554 (1996)) (relevant definition of "product" is "the totality of goods or services that a company makes available") (emphasis added); Appx0892–0894 (Random House Compact Unabridged Dictionary at 1554 (2d ed. 1996)) (same definition). Appellees never presented a contrary definition of "product."[4]

---

[4] Appellees also never disputed that Priceline itself used the term "product" to apply to services listed and sold through its network, at a time just months after the filing date of the regular application and before issuance of the '399 Patent. *See* Appx0831.

Instead, the district court gave weight to dictionary definitions of the term "merchants" as sellers of goods. Appx1422 ("[A]s those definitions bear, … merchants sell goods. That's what merchants do."). But a court may only "rely on dictionary definitions 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" *Trs. of Columbia Univ.*, 811 F.3d at 1363 (quoting *Phillips*, 415 F.3d at 1321–22). The patentee's express definition of "merchants" in the incorporated provisional application precludes reliance on such definitions here.

Also contradicting the dictionary definitions of "merchants" are the scores of places in the regular application's specification describing merchants as selling "products," *see, e.g.,* Appx0540 (6:56–57); Appx0548 (21:36–37, 22:17–19), which, according to the uncontested dictionary definition of "product," includes both goods and services.

Moreover, dictionary definitions are less powerful extrinsic evidence than usage in the relevant field. *See, e.g., Phillips*, 415 F.3d at 1322 ("we have stated that a general-usage dictionary cannot overcome art-specific evidence of the meaning of a claim term . . .") (internal quotation marks and citation omitted). The sole evidence about use in the

relevant field confirms that artisans (including in prior art cited by appellees) used the term "merchant" (or "merchandiser") to refer to a seller of either goods or services. *See* Appx0914 (U.S. Patent No. 6,330,575 at 2:52–53 referring to "merchants desiring to sell goods *and services* over the Internet..."); Appx0927 (*InfoHaus Seller's Guide*, May 1, 1996, 4, describing one example of "products" as a "subscription service."); Appx0932 (*Electronic Commerce Environments: Corporate Obstacles and Opportunities to Competitiveness*, Chris Vestal, Aug. 1, 1999, surveying ecommerce systems and noting "online storefronts" as offering "products and services."); Appx0942 ("The Opportunity: Affiliate Networks: A Revolution in Retail," *beFree*, May 1998, describing an "electronic commerce site" which enrolls "online merchandisers" offering both "products and services" through an affiliate's "electronic store.").

### G. The term "commerce object" should be interpreted consistently with the term "merchants" and held to likewise include services.

The district court gave no independent rationale for its construction of the term "commerce object" to not include services. It held, and the parties agreed, that its resolution of the claim construction dispute over the inclusion of "services" in the term "merchants" resolved the

same issue with respect to the parties' proposed constructions of "commerce object." Appx1423–1424 ("So then, you agree. I mean, I've effectively construed that.").

The arguments presented in the preceding parts A-F therefore likewise apply to this term. The patent discloses "commerce objects" as what a merchant sells, and specifically identifies "commerce objects" as including "products," which—as specified in part F above and as recognized by the district court—is a word that the uniform evidence demonstrates encompasses both goods and services. The only dictionary definitions of "products" in this record and the only evidence concerning use of that term in the relevant field at the relevant time both confirm that "products" includes services. *See supra* pp. 23–25.

Nor can Defendants' general-purpose dictionary definitions of the word "object"—taken out of context with respect to the term "commerce object"—override the multiple references to "services" in the incorporated provisional application. These references constitute intrinsic evidence showing that a service can be the "object" of a link and an "object" of commerce addressed by the patented system. *See, e.g., Philips,* 415 F.3d 1317 ("while extrinsic evidence can shed useful light on the

relevant art, we have explained that it is less significant than the intrinsic record in determining 'the legally operative meaning of claim language.") (internal citations and quotation marks omitted).

Accordingly, this Court should reverse the district court's construction of "commerce object" as relating to "products" consisting only of goods and adopt DDR's construction that "commerce object" includes both goods and services.

## VII. CONCLUSION

To affirm the district court would be to find that a patentee can implicitly disclaim an express lexicographic definition set forth in the specification by describing features of a preferred embodiment. This is the opposite of what this Court's *en banc* holding in *Phillips* and its countless progeny require. The Court should reverse the district court and construe "merchants" and the related term "commerce object" as a matter of law according to the patentee's express definition that includes both goods and services.

Dated: February 7, 2023        Respectfully submitted,

/s/   *Ian B. Crosby*
Ian B. Crosby (Principal Attorney)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000

Seattle, WA 98101
Telephone: (206) 516-3880
icrosby@susmangodfrey.com

Louis J. Hoffman
HOFFMAN PATENT FIRM
7689 East Paradise Lane, Suite 2
Scottsdale, AZ 85260
Telephone: (480) 948-3295
louis@valuablepatents.com

Shawn D. Blackburn
Meng Xi
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 653-7822
Telephone: (713) 653-7851
sblackburn@susmangodfrey.com
mxi@susmangodfrey.com
*Attorneys for Plaintiff-Appellant DDR
Holdings, LLC*

**Appeal No. 2023-1176, 2023-1177**

───────────────────────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

────────────────

**DDR HOLDINGS, LLC,**
*Plaintiff-Appellant,*

***v.***

**PRICELINE.COM LLC, BOOKING.COM B.V.,**
*Defendants-Appellees.*

────────────────

Appeals from the United States District Court for the District of Delaware in No.
1:17-cv-00498-CFC-JLH, 1:17-cv-00499, Chief Judge Colm F. Connolly

───────────────────────────────

**ADDENDUM TO BRIEF FOR APPELLANT DDR HOLDINGS, LLC
PURSUANT TO FED. CIR. R. 28**

───────────────────────────────

## **TABLE OF CONTENTS**

| DOCUMENT | PAGE NUMBER* |
|---|---|
| Final Judgment, D.I. 188, *DDR Holdings, LLC v. Priceline.com LLC et al.*, 17-cv-498 (D. Del. November 4, 2022) | Appx0001 |
| Joint Stipulation of Non-Infringement, D.I. 187, *DDR Holdings, LLC v. Priceline.com LLC et al.*, 17-cv-498 (D. Del. November 4, 2022) | Appx0003 |
| Claim Construction Order, D.I. 182, *DDR Holdings, LLC v. Priceline.com LLC et al.*, 17-cv-498 (D. Del. November 2, 2022) | Appx0008 |
| U.S. Patent No. 7,818,399 (Exhibit 1 to Plaintiff's Motion for Claim Construction), D.I. 129-1, *DDR Holdings, LLC v. Priceline.com LLC et al.*, 17-cv-498 (D. Del. May 10, 2022) | Appx0508 |

.

*Page Numbers reflect pagination in forthcoming Joint Appendix

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DDR HOLDINGS, LLC,

Plaintiff,

v.

PRICELINE.COM LLC, *et al.*,

Defendants.

C.A. No. 17-498-CFC-JLH (lead case)
C.A. No. 17-499-CFC (consolidated)

## [~~PROPOSED~~] FINAL JUDGMENT

Before the Court is the parties' Joint Stipulation of Non-Infringement and Motion for Entry of Final Judgment. The parties have stipulated and agree that, under the Court's construction of either the term "merchants" or "commerce object," the Accused Instrumentalities (Priceline's Priceline Partner Network and any successor program and Booking.com's Affiliate Partner(s) Programme and Affiliate Partner(s) Program and any successor program) do not infringe any asserted claim of the asserted patent, U.S. Patent No. 7,818,399.

Pursuant to the parties' Joint Stipulation of Non-Infringement, the Court **ENTERS THIS FINAL JUDGMENT** in favor of Defendant Priceline.com LLC and Defendant Booking.com B.V (collectively "Defendants") on Plaintiff DDR Holdings, LLC's claim for infringement of the asserted claims of U.S. Patent No. 7,818,399. The Court **DISMISSES WITHOUT PREJUDICE** Defendants' defenses and affirmative defenses.

**Appx0001**

The Court further **ORDERS** that the time for filing a bill of costs under Local Rule CV-54.1 and Fed. R. Civ. P. 54(d) and the time for filing any motion for attorney fees is extended until 30 days after the time to appeal has expired, or, if an appeal is filed, until 30 days after the appellate court's issuance of the mandate regarding the appeal of this Court's final judgment.

All motions by either party not previously ruled on are hereby **DENIED.**

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Date: *11.4.22*

The Honorable Colm F. Connolly

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DDR HOLDINGS, LLC,

                Plaintiff,

     v.

PRICELINE.COM LLC, *et al.*,

                Defendants.

C.A. No. 17-498-CFC-JLH (lead case)

C.A. No. 17-499-CFC (consolidated)

## JOINT STIPULATION OF NON-INFRINGEMENT AND MOTION FOR ENTRY OF FINAL JUDGMENT

Based on the Court's construction of the claim terms "merchants" and "commerce object," the parties[1] herby stipulate to non-infringement and request that the Court enter a final judgment of non-infringement.

DDR accused Priceline's Priceline Partner Network and any successor program and Booking.com's Affiliate Partner(s) Programme and Affiliate Partner(s) Program and any successor program (the "Accused Instrumentalities") of infringing U.S. Patent 8,515,825 ("the '825 Patent"), U.S. Patent 9,043,228 ("the '228 Patent"), U.S. Patent 9,639,876 ("the '876 Patent"), and U.S. Patent 7,818,399 ("the '399 Patent"). Based on a stipulation by the parties, the Court ordered that any and all claims of patent infringement by Defendants of the '825

---

[1] The parties are Plaintiff DDR Holdings, LLC ("Plaintiff"), and Defendant Priceline.com LLC, and Defendant Booking.com B.V (collectively, "Defendants").

Patent, '228 Patent, and '876 Patent be withdrawn and dismissed from this case. D.I. 118. Accordingly, the '399 Patent is currently the only remaining patent in this case. And, per Plaintiff's final election of asserted claims, only claims 1, 3, 7, 14, and 16 of the '399 Patent remain in this case.

On October 25, 2022, the Court held a claim construction hearing construing certain terms of the '399 Patent. D.I. 180 (October 25, 2022 Hr'g Tr.). At the hearing and in a subsequent order, the Court construed the term "merchants" as "producers, distributors, or resellers of the goods to be sold" and denied Plaintiff's proposed construction of "merchants" as "producers, distributors, or reseller of the goods or services to be sold." D.I. 180 (October 25, 2022 Hr'g Tr.) at 78:11–84:12; D.I. 182 at 2. The Court indicated that it would not "import the words 'or services'" into the proposed construction. D.I. 180 (October 25, 2022 Hr'g Tr.) at 78:11–84:12. The Court also construed "commerce object" as "a product, a product category, a catalog, or an indication that a product, product category, or catalog should be chosen dynamically" and denied Plaintiff's proposed construction of "commerce object" as "a product (goods or services), a product category, a catalog, or an indication that a product (goods or services), product category, or catalog should be chosen dynamically." D.I. 180 (October 25, 2022 Hr'g Tr.) at 86:6–17, 135:1–9; D.I. 182 at 2. Specifically, the Court indicated that

it was adopting "Defendants' construction of 'commerce object,' which excludes services." D.I. 180 (October 25, 2022 Hr'g Tr.) at 86:6–17, 135:1–9.

The parties agree that the Accused Instrumentalities do not infringe the asserted claims of the '399 Patent under the Court's claim constructions and that the Court's construction of either the term "merchants" or the term "commerce object" is case-dispositive in Defendants' favor on the issue of infringement.

Accordingly, the parties hereby stipulate and agree that, under the Court's construction of either the term "merchants" or "commerce object," the Accused Instrumentalities are not covered by any asserted claim of the '399 Patent.

In order to conserve judicial resources and to enable appellate review, the parties respectfully request that the Court enter final and appealable judgment of non-infringement in favor of Defendants. The parties further request that the Court dismiss without prejudice Defendants' defenses and affirmative defenses, which may be re-raised by Defendants should the case later proceed after appeal.

The parties further request that the time for filing a bill of costs under Local Rule CV-54 and Fed. R. Civ. P. 54(d) and for filing any motion for attorney fees be extended until 30 days after the time to appeal has expired, or, if an appeal is filed, until 30 days after the appellate court's issuance of the mandate regarding the appeal of this Court's final judgment.

**Appx0005**

November 4, 2022

Respectfully submitted,

*/s/ Brian E. Farnan*

Brian E. Farnan (Bar No. 4089)
Rosemary J. Piergiovanni (Bar No. 3655)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
rpiergiovanni@farnanlaw.com


Louis J. Hoffman (admitted *pro hac vice*)
LOUIS J. HOFFMAN, P.C.
7689 East Paradise Lane, Suite 2
Scottsdale, Arizona 85260
Telephone: (480) 948-3295
Facsimile: (480) 948-3387
louis@valuablepatents.com


Ian B. Crosby (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: 206.516.3861
Facsimile: 206.516.3883
Email: icrosby@susmangodfrey.com


Shawn Blackburn (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 653-7822

*/s/ Francis DiGiovanni*

Francis DiGiovanni (#3189)
Thatcher A. Rahmeier (#5222)
**DRINKER BIDDLE & REATH LLP**
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@dbr.com
thatcher.rahmeier@dbr.com


Jeremy J. Taylor (*Pro Hac Vice*)
Mark Oda (*Pro Hac Vice*)
Bradley Shigezawa (*Pro Hac Vice*)
**BAKER BOTTS L.L.P.**
101 California Street, Suite 3200
San Francisco, CA 94111
(415) 291-6200
Jeremy.taylor@bakerbotts.com
Mark.oda@bakerbotts.com
Bradley.Shigezawa@bakerbotts.com


Peter H. Kang (*Pro Hac Vice*)
**BAKER BOTTS L.L.P.**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
(650) 739-7500
Peter.kang@bakerbotts.com


Margaret Welsh (*Pro Hac Vice*)
Joshua Friedman (*Pro Hac Vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, NY 10112-4498
(212) 408-2500
Margaret.welsh@bakerbotts.com

4

**Appx0006**

Email:
sblackburn@susmangodfrey.com

Joshua.friedman@bakerbotts.com

*Attorneys for Defendants*

J. Craig Smyser (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 6th Ave, 32nd Floor
New York, NY 10019
Tel: (212) 729-2023
Email: csmyser@susmangodfrey.com

*Attorneys for Plaintiff*

IT IS SO ORDERED this ⟨signature⟩ day of November, 2022.

_____
The Honorable Colm F. Connolly

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DDR HOLDINGS, LLC,<br><br>      Plaintiff,<br><br>   v.<br><br>PRICELINE.COM LLC, *et al.*,<br><br>      Defendants. | C.A. No. 17-498-CFC-JLH (lead case)<br><br>C.A. No. 17-499-CFC (consolidated) |

## [PROPOSED] ORDER

For the reasons stated during the Markman hearing held on October 25, 2022, the Court adopts the following constructions for the below identified terms in U.S. Patent No. 7,818,399:

### I.    Agree-Upon Constructions:

| CLAIM TERMS | COURT'S CONSTRUCTIONS |
|---|---|
| "web page owner" ['399 Patent, claim 1] | "an operator of a web page that engages in Internet commerce by incorporating one or more links to an e-commerce outsource provider into it web content"[1] |

### II.    Disputed Claim Constructions:

| CLAIM TERMS | COURT'S CONSTRUCTIONS |
|---|---|
| "outsource provider" ['399 Patent, claim 1] | "a party that provides e-commerce support services between merchant(s) and host(s)"[2] |

---

[1] Joint Claim Construction Br., D.I. 147 at 3.

[2] D.I. 180 (October 25, 2022 Hr'g Tr.) at 131:11-132:20, 133:7-134:18.

1

| "merchants" ['399 Patent, claims 1, 7, 15] | "producers, distributors, or resellers of the goods to be sold"[3] |
| "commerce object" ['399 Patent, claims 1, 7, 14] | "a product, a product category, a catalog, or an indication that a product, product category, or catalog should be chosen dynamically"[4] |
| "derived from the retrieved pre-stored data" ['399 Patent, claim 1] | Ordinary meaning; construction not necessary[5] |

Further, for the reasons stated during the Markman hearing, Defendants may reraise later in the case without prejudice the arguments they raised during the Markman hearing with respect to the terms "outsource provider" and "derived from the retrieved pre-stored data" and reraise the arguments Defendants raised for "merchants" as it relates to adding "through the outsource provider" to the construction. *See* D.I. 180 (October 25, 2022 Hr'g Tr.) at 133:7-134:18; 136:6-13.

The Honorable Colm F. Connolly
United States District Judge

---

[3] *Id.* at 76:18-15, 78:11-84:12, 133:7-134:18.

[4] *Id.* at 86:6-17, 135:1-9.

[5] *Id.* at 117:23-120:21; 133:7-134:18.

2

**Appx0009**

# EXHIBIT 1

US007818399B1

(12) **United States Patent**
Ross, Jr. et al.

(10) Patent No.: **US 7,818,399 B1**
(45) Date of Patent: **Oct. 19, 2010**

(54) **METHODS OF EXPANDING COMMERCIAL OPPORTUNITIES FOR INTERNET WEBSITES THROUGH COORDINATED OFFSITE MARKETING**

(75) Inventors: **D. Delano Ross, Jr.**, Alpharetta, GA (US); **Daniel D. Ross**, Dunwoody, GA (US); **Joseph R. Michaels**, Marietta, GA (US); **William R. May**, Atlanta, GA (US); **Richard A. Anderson**, Powder Springs, GA (US)

(73) Assignee: **DDR Holdings, LLC**, Dunwoody, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1007 days.

(21) Appl. No.: **11/343,464**

(22) Filed: **Jan. 30, 2006**

**Related U.S. Application Data**

(63) Continuation of application No. 10/461,997, filed on Jun. 11, 2003, now Pat. No. 6,993,572, which is a continuation of application No. 09/398,268, filed on Sep. 17, 1999, now Pat. No. 6,629,135.

(60) Provisional application No. 60/100,697, filed on Sep. 17, 1998.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ...................................... **709/218**; 709/215

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,319,542 A    6/1994   King, Jr. et al. ............... 705/27

5,515,270 A    5/1996   Weinblatt ..................... 705/14
5,537,314 A    7/1996   Kanter ......................... 705/14

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO 98/20434 A2 *    5/1998

OTHER PUBLICATIONS

PCT International Search Report PCT/US99/21656 dated Jan. 25, 2000.

(Continued)

*Primary Examiner*—Patrice L Winder
(74) *Attorney, Agent, or Firm*—Louis J. Hoffman

(57)    **ABSTRACT**

An e-commerce outsourcing system and method provides hosts with transparent, context-sensitive e-commerce supported pages. A plurality of visually perceptible elements associated with and identifying a source of a host's web page are stored in the form of data in a computer database for future use. The host includes one or more links within a page on the host website that correlate with a selected commerce object, which may be contextually related to material in the page. The commerce object can be a buying opportunity for a product of a third-party merchant, a product category containing a plurality of products of third-party merchants, or a dynamic selection indicator of a merchant's product. A plurality of hosts may choose to link to the same commerce object. Upon activation of the link displayed by a particular host website, a visitor computer is served with a page displaying the visually perceptible elements associated with that specific host's website and information associated with the commerce object correlated to the link. Where the commerce object is a dynamic selection indicator, the content is selected at the time of activation based upon an analysis of the page containing the activated link.

**26 Claims, 24 Drawing Sheets**



U.S. PATENT DOCUMENTS

| 5,590,197 | A | | 12/1996 | Chen et al. ..................... 705/65 |
| 5,596,702 | A | | 1/1997 | Stucka et al. ............... 715/746 |
| 5,600,778 | A | | 2/1997 | Swanson et al. .............. 395/333 |
| 5,630,125 | A | | 5/1997 | Zellweger ............. 707/103 R |
| 5,699,528 | A | | 12/1997 | Hogan ........................ 705/40 |
| 5,710,887 | A | | 1/1998 | Chelliah et al. .............. 705/26 |
| 5,712,979 | A | | 1/1998 | Graber et al. .............. 709/224 |
| 5,715,314 | A | | 2/1998 | Payne et al. ................ 705/78 |
| 5,717,860 | A | | 2/1998 | Graber et al. .............. 709/227 |
| 5,721,827 | A | | 2/1998 | Logan et al. .............. 709/217 |
| 5,724,424 | A | | 3/1998 | Gifford ....................... 705/79 |
| 5,724,521 | A | | 3/1998 | Dedrick ....................... 705/26 |
| 5,727,159 | A | | 3/1998 | Kikinis ..................... 709/246 |
| 5,745,681 | A | | 4/1998 | Levine et al. .............. 709/200 |
| 5,768,528 | A | | 6/1998 | Stumm |
| 5,778,367 | A | | 7/1998 | Wesinger, Jr. et al. ......... 707/10 |
| 5,793,368 | A | | 8/1998 | Beer ........................ 345/334 |
| 5,796,393 | A | | 8/1998 | MacNaughton et al. ..... 345/329 |
| 5,796,952 | A | | 8/1998 | Davis et al. ............... 709/224 |
| 5,802,299 | A | | 9/1998 | Logan et al. .............. 709/218 |
| 5,809,481 | A | | 9/1998 | Baron et al. ................ 705/14 |
| 5,812,769 | A | | 9/1998 | Graber et al. .............. 709/228 |
| 5,819,285 | A | | 10/1998 | Damico et al. .......... 707/104.1 |
| 5,825,884 | A | | 10/1998 | Zdepski et al. ............. 705/78 |
| 5,848,396 | A | | 12/1998 | Gerace ....................... 705/10 |
| 5,860,068 | A | | 1/1999 | Cook .......................... 705/26 |
| 5,862,325 | A | | 1/1999 | Reed et al. ................ 709/201 |
| 5,878,219 | A | | 3/1999 | Vance, Jr. et al. ......... 709/217 |
| 5,884,033 | A | | 3/1999 | Duvall et al. .............. 709/237 |
| 5,884,045 | A | | 3/1999 | Kurihara .................. 709/237 |
| 5,890,175 | A | | 3/1999 | Wong et al. .............. 715/505 |
| 5,893,091 | A | | 4/1999 | Hunt et al. .................... 707/3 |
| 5,894,554 | A | | 4/1999 | Lowery et al. ............. 709/203 |
| 5,895,468 | A | | 4/1999 | Whitmyer, Jr. ........... 707/10 |
| 5,897,622 | A | * | 4/1999 | Blinn et al. ............... 715/234 |
| 5,898,836 | A | | 4/1999 | Freivald et al. ........... 709/218 |
| 5,907,830 | A | | 5/1999 | Engel et al. ................ 705/14 |
| 5,913,040 | A | | 6/1999 | Rakavy et al. ............. 709/232 |
| 5,913,202 | A | | 6/1999 | Motoyama ............... 705/36 R |
| 5,915,243 | A | | 6/1999 | Smolen .................... 705/14 |
| 5,918,239 | A | | 6/1999 | Allen et al. .............. 715/526 |
| 5,926,798 | A | | 7/1999 | Carter ....................... 705/26 |
| 5,930,765 | A | | 7/1999 | Martin ...................... 705/14 |
| 5,933,811 | A | | 8/1999 | Angles et al. ............. 705/14 |
| 5,937,392 | A | | 8/1999 | Alberts .................... 705/14 |
| 5,940,834 | A | | 8/1999 | Pinard et al. .............. 707/102 |
| 5,940,843 | A | | 8/1999 | Zucknovich et al. ...... 715/516 |
| 5,948,061 | A | | 9/1999 | Merriman et al. .......... 709/219 |
| 5,956,709 | A | | 9/1999 | Xue .............................. 707/3 |
| 5,963,915 | A | | 10/1999 | Kirsch ........................ 705/26 |
| 5,970,472 | A | * | 10/1999 | Allsop et al. ................ 705/26 |
| 5,978,766 | A | | 11/1999 | Luciw ......................... 705/1 |
| 5,983,227 | A | | 11/1999 | Nazem et al. .............. 707/10 |
| 5,983,270 | A | | 11/1999 | Abraham et al. ........... 709/224 |
| 5,987,498 | A | | 11/1999 | Athing et al. ............. 709/203 |
| 5,991,735 | A | | 11/1999 | Gerace ........................ 705/10 |
| 5,991,740 | A | | 11/1999 | Messer ...................... 705/27 |
| 6,012,098 | A | | 1/2000 | Bayeh et al. .............. 709/246 |
| 6,016,504 | A | | 1/2000 | Arnold et al. |
| 6,023,714 | A | | 2/2000 | Hill et al. .................. 715/513 |
| 6,029,141 | A | | 2/2000 | Bezos et al. ................ 705/27 |
| 6,073,124 | A | | 6/2000 | Krishnan et al. |
| 6,128,655 | A | * | 10/2000 | Fields et al. .............. 709/219 |
| 6,141,006 | A | * | 10/2000 | Knowlton et al. .......... 705/26 |
| 6,141,666 | A | | 10/2000 | Tobin ........................ 715/14 |
| 6,230,173 | B1 | | 5/2001 | Ferrel et al. .............. 715/513 |
| 6,253,188 | B1 | | 6/2001 | Witek et al. ............... 705/14 |
| 6,629,135 | B1 | | 9/2003 | Ross et al. ................ 709/218 |
| 6,763,343 | B1 | | 7/2004 | Brooke et al. ................ 707/1 |
| 2004/0042432 | A1 | * | 3/2004 | Riazi et al. ................ 370/338 |
| 2004/0117442 | A1 | * | 6/2004 | Thielen ...................... 709/203 |

OTHER PUBLICATIONS

Widyantoro, Dwi, et al. "An Adaptive Algotithm for Learning Changes in User Interests," Proceedings of Conference on Knowledge and Information Management, pp. 405-412, Nov. (1999).

Cimino JJ, et al. "Architecture for a Web-Based Clinical Information System that Keeps the Design Open and the Access Closed." Proc. AMIA Symp. 1998, pp. 121-125; Nov. 1998.

"Worldres Teams Up With Yahoo!"; news release from http://www.wiredhotelier.com; Sep. 16, 1998.

Form S-1, Amendment No. 4; filed with Securities and Exchange Commission, by Digital River, Inc.; Aug. 11, 1998.

Nwana, Hyacinth, et al. "Agent-Medicated Electronic Commerce: Issues, Challenges and Some Viewpoints", Proceedings of the 2nd International Conference on Autonomous Agents, pp. 189-196, May (1998).

"Technology Solutions to Electronic Transactions: A White Paper"; Digital River, Inc.; 1998.

"Marketing Software on the Internet: A White Paper"; Digital River, Inc.; 1998.

Hudson, S. et al., Supporting Dynamic Downloadable Appearances in an Extensible User Interface Software and Technology, p. 159-168, Oct. 1997.

"San Diego's CVB Is First To Implement internet Reservations Through Worldres"; news release from http://www.wiredhotelier.com; Sep. 20, 1997.

"Worldres Provides CVBs Free Internet Technology for Web/Voice Hotel Bookings"; news release from http://www.wiredhotelier.com; Jul. 22, 1997.

"Places to Stay, Now WorldRes, Completes $4 Million 1st-Round Venture"; news release from http://www.wiredhotelier.com; Mar. 4, 1997.

Balabanovic, M. and Shophanm, Y., Fab: Content-Based Collaborative Recommendation, Communications of the ACM, vol. 40, No. 3, Mar. 1997, pp. 66-73.

Yergeau, F. et al., "Internationalization of the Hypertext Markp Language," RFC 2070, p. 1-43, Jan. 1997.

"A Multilevel Approach to Intelligent Information Filtering: Model, System, and Evaluation," ACM Transactions on Information Systems, vol. 15, Issue 4 (1997).

"About WorldRes"; web page printout; URL: http://:web.archive.org/web/19970702032337/www.worldres.com;1997.

Chistensen, Eric; "Mapping a More Complete Internet Strategy"; web page printout, URL: http://web.archive.org/web/19970702032753/www.worldres.com; 1997.

Dukay, Kristin. "Unifying a corporate Web site: A case study of www.microsoft.com." Proc. IEEE Int'l Professional Communication Conference 1997, pp. 321-327.

Web Pages, http://www.broadvision.com (1996).

Dialog file 16 (database PROMT®), No. 6016914, BookSite launches version 3.0 of the popular electronic commerce web site, "Business Wife," 2 pp, Feb. 23, 1996.

Dialog file 16 (database PROMT (R)) , No. 6296727, "Amazon.com introduces "Amazon.com Associates"—a new model for internet-based commerce." Business Wife, 3 pp. Jul. 18, 1996).

Can Mixing "Cookies" with Online Marketing be a Recipe for Heartburn? Infoworld, vol. 18, No. 30, Jul. 22, 1996.

RealTime Travel Info Available Online, Dialog database file 9, document 01107096, Jan. 17, 1995.

Online Growth Virtually Untapped; PC Vendors Taking More Advantage of Booming Sales, Computer Retail Week, vol. 4, No. 64, p. 160, Jun. 6, 1994.

Selected documents from Incognito Café Web site describing Book Stacks Unlimited links partner program.

Resnick, P., et al., GroupLens: An Open Architecture for Collaborative Filtering of Netnews, Proceedings of ACM 1994 Conference on Computer Supported Cooperative Work, Chapel Hill, NC, pp. 175-186.

"World Choice Travel, Inc.—Affiliate Program Overview", date not specified.

## US 7,818,399 B1

Page 3

VIESCAS, "The Official Guide To The Prodigy Service", Microsoft Press, (certain pages), 1991.

"Real-Time Travel Information Is Available Online", Newsbytes News Network, Jan. 17, 1995.

Sarkar et al., "Intermediaries and Cybermediaries: A Continuing Role for Mediating Players in the Electronic Marketplace", JCMC vol. 1 No. 3, Dec. 1995.

Hoffman et al., "Commercial Scenarios for the Web: Opportunities and Challenges", http://sloan.ucr.edu/1995/12/24/hoffman-novak-and-chatterjee-december-1995/, Dec. 24, 1995.

Wilson, "The Link Site Marketing Strategy", Web Marketing Today, Issue 13, May 11, 1996.

"The Weather Channel Predicts Sunny Skies For Two New Online Advertisers", PR Newswire Association, Inc., May 14, 1996.

"AT&T Business Network Launches Personal Business Services", PR Newswire Association, Inc., Sep. 9, 1996.

Novak and Hoffman, "New Metrics for New Media: Toward The Development Of Web Measurement Standards", Project 2000: elab. vanderbilt.edu, Vanderbilt University, Sep. 26, 1996.

Deighton, "The Future Of Interactive Marketing", Harvard Business Review, p. 4-16, Nov. 1996.

"MyWay Teams with Lycos, MTV, Others on Push Technology", Post-Newsweek Business Information Inc., Feb. 10, 1997.

"WavePhore Inc.; WavePhore Signs Top Content Partners for WaveTop Home PC Data Broadcasting Service", M2 Communications Ltd., Apr. 9, 1997.

Williams, "Site Can Help the Infrequent Flier In Planning Trips", Richmond Times-Dispatch, Apr. 28, 1997.

Woods, "Booking Your Trip Online; Web Sites Can Be Fast, Frugal—And Frustrating", Kiplinger's Personal Finance Magazine, p. 128-132, May 1997.

Web pages from www.books.com, Jun. 20-23, 1997.

"Time Inc. New Media and WavePhore inc. to Broadcast Internet Content over the WaveTop Wireless Home PC Service", Business Wire, Jul. 21, 1997.

Carmichael, "Net Marketing: Survey Of Developers Shows How Much It Costs To Add Personalization To Sites: Marketers Use Registration Data To Target Their Messages", Crain Communications, Inc., Sep. 1, 1997.

Deighton, "Commentary On Exploring The Implications Of The Internet For Consumer Marketing", Journal of the Academy of Marketing Science, p. 347-351, 1997.

Archived web page at www.hyatt.com, Dec. 10, 1997.

Wilson, "How Does Store-Building Software Work?" Web Commerce Today, Issue 5, Dec. 15, 1997.

"CBS New Media Announces Strategic Partnership with Razorfish", Business Wire, Inc., Jan. 20, 1998.

Schwartz, "Sellers Get a Hand with Affiliate Commerce", Internet Week, Aug. 6, 1998.

"USAHotelGuide.com Brings Focused Approach To Online Hotel Reservations", MacMillan Communications, circa 1999.

Curtis, "Affiliate Programs: Why They're Going to Last", archived web page www.oneandonlynetwork.com, Sep. 15, 1999.

"Must See Sites", Family PC, pp. 102, 104, Jun. 1997.

"Preview Travel, Inc., S.E.C. Form 10-K", p. 1-14, Dec. 31, 1997.

"Preview Travel, Inc., 10K405—EX-10.16, Agreement Dated as of Mar. 15, 1998".

Archived web page at www.city.net, May 14, 1998.

"Preview Travel; 1998 Annual Report", Preview Travel, circa 1998.

Archived web page at www.CyberSexToys.com; June 7, 1997.

Archived web page at www.CyberSexToys.com; Oct. 19, 1997.

Archived web page at www.SexToyFun.com, Dec. 5, 1998.

Archived web page at www.SexToy.com, Dec. 12, 1998.

Archived web page at www.SexToy.com, Feb. 3, 1999.

Perdue, "EroticaBiz; How Sex Shaped The Internet", IdeaWorx, Chapter 4, Oct. 2002.

Levine, "dave david levine sextoys sex toys hollywood party parties religion money", www.davelevine.com, Aug. 11, 2006.

"WHOIS Search Results for SexToy.com", Network Solutions, record created on May 2, 1995.

"WHOIS Search Results for SexToyFun.com", Network Solutions, record created on Sep. 9, 1998.

Archived web page at TechWave.com, Feb. 1, 1998.

Baker, "TechWave Boosted by $25M", Puget Sound Business Journal, Apr. 24, 1998.

Lang, "Product Review; TechWave PersonalStore", http://sellitontheweb.com, Aug. 15, 1998.

Various white papers from www.Broadvision.com, Jan. 22, 1996.

Screenshots of archived web page at http://HardRock.com, Dec. 21, 1997.

Screenshots of "AIG SunAmerica; Helping You . . . Achieve Your Vision of Retirement", https://www.SunAmerica.com, 1997.

"SunAmerica.com Market Summary; Terms and Conditions", http://fast.quote.com, 1997.

"SunAmerica.com Market Summary; Quotes and News", http://fast.quote.com, Aug. 7, 2006.

"The Harvard Crimson Online; Quotes, Charts, Portfolio & Reports", http://www.dbc.com, 1996.

"Data Broadcasting's Real-Time Quotes On Internet", Post-Newsweek Business Information, Inc., Apr. 29, 1996.

Archived web page at www.dbc.com, Nov. 2, 1996.

Archived web page at www.dbc.com, Dec. 19, 1996.

Archived web page at www.dbc.com, Jul. 5, 1997.

Sample Business Contracts—Contribution agreement among CBS Inc., Data Broadcasting Corporation and Marketwatch.com, LLC, http://contracts.onecle.com, Oct. 29, 1997.

"Cnet; Quotes, Charts, Portfolio & Reports", http://www.dbc.com, 1996.

Archived web page www.ibm.com, Oct. 26, 1996.

"IBM Customer Financing; Worldwide Customer Financing", IBM Corp., 1995.

"IBM Planetwide Direct", IBM Corp., 1996.

"WHOIS Search Results for IBM.com", Network Solutions, record created Mar. 19, 1986.

Archived web page www.one-and-only.com, Jun. 12, 1997.

"WHOIS Search Results for oneandonlynetwork.com", Network Solutions, record created Sep. 15, 1998.

Archived web page www.onandonlynetwork.com, September 13, 1999.

Wilson, "Adding Value: The Key To Securing Links To Your Site", Web Marketing Today, Issue 43, Apr. 1, 1998.

"WHOIS Search Results for one-and-only.com", Network Solutions, record created Nov. 30, 1995.

Archived web page www.one-and-only.com, Aug. 31, 1999.

Archived web page www.oneandonlynetwork.com, Sep. 8, 1999.

"Internet Travel Network; Half a million hits daily", 1997.

"GetThere.com—Private Label Service", 1997-2001.

"ITN Announces Internet Package For Agencies", Aug. 26, 1995.

"Reply to RFP; Internet Travel Network", www.itn.net, Nov. 7, 1995.

"About The Internet Travel Network / Future Directions; Internet Travel Network", www.itn.net, 1996.

"A Quote to Meetings and Sports; Internet Travel Network", www.itn.com, Nov. 27, 1995.

"Greetings; If you haven't taken the time to look at becoming a member . . . ", Internet Travel Network News, 1997.

Elliott, "Point of Sale; Taming The Wild Web; The ATA Issues Recommendations for Online Booking", Travel Agent, p. 24, May 19, 1997, [year uncertain].

"Internet Travel Network's Guide To Online Marketing; Successful Online Strategies", Jun. 21, 1996.

"Car and Hotel Functionality; Internet Travel Network Becomes First Full-Service Travel Site to Go Online With Car & Hotel Reservations", Business Wire, June 24, 1996.

"Travel Industry Embraces Internet Travel Network As A Leading Web-Based Solutions", Business Wire, July 22, 1996.

"Internet Travel Network Announces Internet Travel Manger; Customized Service Supports Corporate Travel Management With Special Functionality", Business Wire, Aug. 5, 1996.

"Preview Travel; Ticket to Ride, Net Style", The Red Herring, p. 52, 54, 56, Fall 1996.

"Internet Travel Network Becomes First Web-Based Travel Booking Service to Access All 4 Major Computer Reservation Systems", Oct. 7, 1996.

"Global Discount Travel Services With Internet Travel Network Release First Discount Travel Reservation Service Available To Consumers On The Internet", Oct. 26, 1996.

"Internet Travel Network Pricing", Nov. 8, 1996.
Archived web page www.ticketmaster.com, Mar. 20, 1997.
"Internet Travel Network Releases New Technology for New Year", Jan. 1, 1997.
"New Alliances Further Geoworks' Plan To Deliver Valuable Content, Interactive Services To Smart Phone Customers", Feb. 3, 1997.
"Internet Leader Recognized by Travel Industry", Business Wire, Feb. 25, 1997.
"Internet Travel Network Releases Policy-Compliant Low-Fare Search Module For Internet Travel Manager", Business Wire, Feb. 28, 1997.
"Excite and Preview Travel Join Forces To Offer Reservations Service", Preview Travel, Apr. 7, 1997.
"CNN Interactive and Internet Travel Network Partner on CNN's Travel Guide", Business Wire, Apr. 16, 1997.
"Worldview Systems And Internet Travel Network Team-Up To Launch Outtahere: A Private-Label Online Travel Planning And Reservation Product", Apr. 8, 1997.
"Internet Travel Network And Pegasus Systems / TravelWeb Announces Partnership For Online Air And Hotel Bookings", Business Wire, Apr. 21, 1997.
Levere, "Cuts In Commissions Prompt Fear That Online Travel Options May Thin", New York Times; CyberTimes, May 30, 1997.
Bush, "Interview of Ken Orton; President, Preview Travel", Electronic Retailing, p. 32-36, May/Jun. 1997.
"Sabre Travel Information Network", date not specified.
"User's Guide; Eaasy Sabre", Dec. 1988.
"Reference Guide; Easy Sabre", 1991.
"The Communication Medium Of The 90's Arrives Oct. 1st"; Jaguar Magazine; vol. 1, No. 1; circa 1990.
Schepp et al., "The Complete Guide To CompuServe", Osborn McGraw-Hill, 1990.
"SpeakEaasy; A Newsletter For Eaasy Sabre Subscribers", vol. VI, No. 1, May 1992.
SabreVision Brochure, Sabre Travel Information Network, 1993.
Moad, "Sabre Rattled; New Strategy For AMR Corp's Sabre CRS Real-Time Database; Includes Related Article On Sabre's Mainframe Computers; Company Business And Marketing", PC Week, vol. 13, No. 4, Jan. 29, 1996.
"Sabre Business Travel Solutions Announces Expense Management Portfolio", Sabre Business Travel Solutions, Aug. 6, 1996.
"Sabre and IBM To Jointly Develop Notes-Enabled Travel Management Product", Sabre Business Travel Solutions, Aug. 6, 1996.
Wilkinson, "Intranets Ease Travel Booking", Business Travel News, Aug. 19, 1996.
Rosen, "Industry Goes Intranet", Business Travel News, Issue 353, p. 1, 26, Aug. 19, 1996.
Ng, "Choosing A System; The Increasing Availability and Sophistication of Software Systems Makes Travel Management a snap", Travel Agent, p. 78, Aug. 26, 1996.
Elliott, "Enter The Giant; Microsoft Unveils a Three-pronged Plan to Become a Powerhouse in Online Travel", Travel Agent, p. 84-86, Sep. 9, 1996.
Rosen and O'Connor, "BTS Signs Up Partners", Business Travel News, Sep. 9, 1996.
Rosen, "Early Birds Get Tools", Business Travel News, Issue 355, p. 1, 36-37, Sep. 16, 1996.
Ng, "Looking For New Electronic Products to Help Manage Your Business? Sabre May Have the Answer", Travel Agent, p. 62, Sep. 16, 1996.
Bittle, "Andersen: On-Line Booking A Natural Progression", Travel Weekly, Sep. 19, 1996.
Andrews, "Cisco Tests Travel Service On Its Intranet", www.iworld.com, reprinted from Web Week, vol. 2, Issue 14, Sep. 23, 1996.
Maddox, "Traveling On The Web; Travelocity refines its Web site to better compete for travel reservations", Information Week, p. 63-65 Jan. 20, 1997.
"Sabre, BTI Americas Create Alliance; ManTIS Architecture Gains Strength Of Sabre Business Travel Solutions", PRNewswire, Feb. 24, 1997.
Foley, "Sabre's Challenge; Reservations group adds new apps to its mainframe core to win customers", Information Week, p. 83-85, Aug. 18, 1997.

"US Airways And The Sabre Group Sign Letter Of Intent For A Multi-Billion Dollar Long-Term Technology Relationship", The Sabre Group, Aug. 28, 1997.
"The Future Belongs To Those With The Vision To See It", PhoCus Wright The Online Travel Conference, Nov. 3, 1997.
"Life with the Internet", Internet Magazine; Digital Reprint Edition, p. 108-112, Oct. 1994.
"Quote.com Network Provides Online Advertisers With High-Volume Impressions, Valued Demographics; Leading Internet Network Gains Momentum With Premier Co-Branded Sites", PR Newswire, Dec. 3, 1996.
"Quote.com To Provide Business Week Online With Up-To-The-Minute Financial Market Data; The Web's Premier Financial News And Information Service Now Integrated With Business Week Online's Web Site", PR Newswire, Dec. 3, 1996.
"Excite and Quote.Com Partner To Deliver Stock Quotes And Business News to Excite Network; Leading Brands Provide Consumers Stock Quotes, Business Updates, News And Information", PR Newswire, Mar. 3, 1997.
"Quote.com Further Levels Playing Field For Independent Investors With Powerful New Ver . . . ", www.quote.com, May 11, 1998.
"A Letter from Stock-Trak to Quote.com", Jul. 13, 1998.
Archived web page http://fast.quote.com, Dec. 6, 1998.
Archived web page http://fast.quote.com, Dec. 7, 1998.
Archived web page www.stocktrak.com, Jan. 27, 1999.
Archived web page http://fast.quote.com, Jan. 28, 1999.
Archived web page http://fast.quote.com, Feb. 9, 1999.
Archived web page http://fast.quote.com, Feb. 19, 1999.
Archived web page http://fast.quote.com, May 8, 1999.
"TeamWARE", TeamWARE Group, p. 1-25, 1996.
"TeamWARE And The Internet; Synergies For A Comprehensive Computing Environment", TeamWARE Group, p. 1-15, Mar. 13, 1996.
"Tech Squared Announces That New Web Site Is Operational; Expects Digital River Site Up And Running by Mid-June", Business Wire, Inc., Jun. 5, 1996.
"Digital River Announces First Encrypted Software Sale", PR Newswire Association, Inc., Aug. 12, 1996.
Woollacott, et al., "Web Spoofing Poses New Security Threat", Info World, vol. 19, Issue 1, p. 33-34, Jan. 6, 1997.
Archived web page www.digitalriver.com, Apr. 12, 1997.
Archived web page www.qfx.com, Jul. 7, 1997.
"Claw(Physical Shipment) 1st Software", www.3digitalriver.com, Jan. 5, 1998.
"Electronic Software Distribution Agreement", Digital River, Inc. and Fujitsu Software Corp., p. 1-14, Jul. 16, 1997.
"Welcome to Blue Byte Software, Inc. Electronic Ordering!!" www3.digitalriver.com, Aug. 11, 1997.
"Corel Teams With Digital River To Expand Online Shopping Centre", PR Newswire Associate, Inc., Aug. 14, 1997.
"Digital River Signs 500th Client For Internet Software Delivery", PR Newswire Association, Inc., Aug. 20, 1997.
"Tympani Development Store", www4.digitalriver.com, Aug. 24, 1997.
"Lucida Font Family; Please select from the following:", www3.digitalriver.com, Aug. 25, 1997.
"DTP Direct", www4.digitalriver.com, Aug. 28,1997.
"Digital River To Offer Symantec Products To Its Online Dealer Network", PR Newswire Association, Inc., Sep. 10, 1997.
Kistner, et al., "Lets Go Shopping", PC Magazine, certain pages, Nov. 18, 1997.
"2ask Software Store", www3digitalriver.com, Nov. 24, 1997.
Archived web page www.digitalriver.com, Dec. 21, 1997.
Giombetti, "Avant-Garde Entrepreneur; Joel Ronning of Digital River Is Racing To Keep His Online Software Delivery Company Out In Front In What He Believes Will Eventually Be A Global Oligopoly", Minnesota Business & Opportunities, Dec. 1997.
Email exchange between Scott Platt of Digital River and Steve Estv Anik re: "Status of changes", Jan. 2, 1998.
Digital River Press Release, "Digital River Signs Online Partnership With J&R Computer World", Jan. 19, 1998.
"Ron Scott, Inc.; QFX The Ultimate Image Editing Solution", www.digitalriver.com, Mar. 14, 1998.

"SFS Software Store", www.digitalriver.com, Mar. 14, 1998.

"North Beach Labs Software Store; Disk Duplicator", www.digitalriver.com, Mar. 14, 1998.

"Sapient Software Store", www.digitalriver.com, Mar. 16, 1998.

"Auto F/X Corporation Software Store", www.digitalriver.com, Mar. 31, 1998.

"The Ultimate Directory—InfoSpace", www.infospace.com, Apr. 10, 1998.

"Integratech Software Store", www.digitalriver.com, Mar. 30, 1998.

"DTP Direct Software Store", www.digitalriver.com, May 28, 1998.

"Innovation Multimedia Software Store", www.digitalriver.com, May 29, 1998.

"MicroProse, Inc. Software Store", www.digitalriver.com, Jun. 24, 1998.

"MicroProse, Inc. Software Store", www.digitalriver.com, Jun. 30, 1998.

"MicroProse Games List", www.microprose.com, Mar. 10, 1998.
Screen shots of BuyComp web site hosted on both buycomp.com and digitalriver.com.

"Digital River; The Journey Continues", 1998.

"Corporate Backgrounder", Traveling Software, Jun. 22, 1998.

"PIM Sari Software Store", www.digitalriver.com, Mar. 26, 1998.

"Extended Help Center; 1st Stop", www.1stopsoft.com, Nov. 14, 1997.

"Visual Office: The best personal productivity tool; Drowning In Infoglut? Spending Too Much Time Searching?", visualoffice.pair.com, Oct. 9, 1997.
Archived web page www.bistream.com, Jan. 17, 1997.
Bitsteam Typeface Library; Online Ordering, date not specified.
Archived web page www2.digitalriver.com, Oct. 19, 1996.

"Arrow Publishing Software Store", www.digitalriver.com, May 14, 1998.

"Ositis Software Store", www.digitalriver.com, Apr. 3, 1998.

"Net Nanny Software Store", www.digitalriver.com, Apr. 14, 1998.

"Sunbow International, Inc Software Store", www.digitalriver.com, Mar. 14, 1998.

"Bizplan Bulder interactive", www.digitalriver.com, Mar. 11, 1998.

"Adaptec, Inc. Software Store", www.digitalriver.com, Jul. 21, 1998.

"Valley of Fire Software Online Store", www.digitalriver.com, Dec. 22, 1999.

"Jan's Journeys", www3.digtialriver.com, Aug. 26, 1997.

"Welcome To Whirlwind Technologies Electronic Ordering System", www3.digitalriver.com, Jun. 18, 1997.

"Peach System Software Store; MVP Software, Inc.", www.digitalriver.com, Mar.14, 1998.

"Olympus America Inc. Software Store", www.digitalriver.com, Jun. 22, 1998.

"Peak Technology Ltd. Software Store", www.digitalriver.com, Feb. 15, 1999.

"PY Software, Inc Software Store", www.digitalriver.com, Mar. 14, 1998.

"RBC, Inc. Software Store", www.digitalriver.com, May 11, 1998.

"Welcome to QRS Music, Inc. Electronic ordering", www.digitalriver.com, Mar. 14, 1998.

"Welcome To Global Majic Software, Inc. Electronic ordering", www3.digitalriver.com, Aug. 11, 1998.

"InterDimensions Corp Software Store", www.digitalriver.com, May 5, 1998.

"Intelligent Technologies Software Store", www.digitalriver.com, May 5, 1998.

"Global Majic Software, Inc. Software Store", www.digitalriver.com, May 20, 1998.

"Lateral Technologies Software Store", www.digitalriver.com, Apr. 30, 1998.

"Internet Neighborhood; KNOWARE, Inc.", www3.digitalriver.com, Feb. 9, 1998.

"KH Software Development Online Store", www.digitalriver.com, Dec. 1, 1999.

"Open Window Software Store", www.digitalriver.com, May 11, 1998.

"Welcome to the Live Picture Online Store", www3.digitalriver.com, Aug. 15, 1997.

"WinSite Software Store", www.digitalriver.com, Feb. 4, 1998.

"Apple Mountain Software Store", www.digitalriver.com, Apr. 10, 1998.

"DTP Direct Software Store", www.digitalriver.com, May 12, 1998.

"M. Casco Associates Software Store", www.digitalriver.com, May 26, 1998.

"Mach5 Software Store", www.digitalriver.com, May 11, 1998.

"Cyber 411", www3.digitalriver.com, Feb. 4, 1998.

"Matchup Sports Software Store", www.digitalriver.com, May 6, 1998.

"Markus Friberg Data Software Store", www/digitalriver.com, May 6, 1998.

"ARCaine Technology", inv1.digitalriver.com, May 12, 1997.

"ARCaine Technology", www4.digitalriver.com, May 9, 1997.

"Artbeats Software Store", www.digtialriver.com, Jan. 28, 1998.

"Author Direct Shareware Software Store", www.digitalriver.com, Apr. 14, 1998.

"Best Effort Software Store", www.digitalriver.com, Apr. 13, 1998.

"BuenSoft Co. Software Store", www.digitalriver.com, Apr. 30, 1998.

Archived web page www.1stsoftware.com, Apr. 21, 1998.
Century Technology Group Summary, Apr. 17, 1998.

"Microshops Proposal", Jan. 22, 1998.
Letter to Unicoil from Del Ross, Feb. 3, 1998.
Century Technology Group—A Nexchange Proposal for Dunwoody Gourmet, Mar. 11, 1998.
Archived webpage at www.e-merchant-group.com, May 16, 1998.
Archived web page at www.Statenisland.com; Apr. 18, 1997.
Archived web page at www2.travelnow.com; Sep. 21, 1999.
Archived web pages at www.sextoy.com; May 17, 1998.
Andrews; "Partners in Affiliate Marketing Struggle with Branding Issues"; Internet World; Apr. 13, 1998.
Marciano; "Are Affiliate Programs for You?"; Web Marketing Today; Apr. 1, 1998.
Archived web pages at www.one-and-only.com; Apr. 1999.
Archived web page at www.financing.hosting.ibm.com; Dec. 27, 1996.
Archived web page at www.ibm.com; Dec. 20, 1996.
Archived web page at www.dbc.com; (NYSE); 1996.
"Data Broadcasting to Offer Real-time Internet Quote Service for $29.95 a Month"; M2 Presswire; Jan. 3, 1996.
"Data Broadcasting Real-time Stock Market Quote Service Begins; $29.95 Monthly Fee Includes Mandatory Exchange Fees"; Business Wire; Apr. 26, 1996.
Archived web page at www.dbc.com; Nov. 15, 1996.
Quote.com Provides Seven High-Profile Web Sites with Financial News and Information; PR Newswire; Jun. 10, 1996.
BPAI decision; Ex parte DDR Holdings, LLC; Appeal 2009-0013987; Reexamination Control U.S. Appl. No. 90/008,374; Patent No. 6,993,572; Apr. 16, 2010.
BPAI decision; Ex parte DDR Holdings, LLC; Appeal 2009-0013988; Reexamination Control U.S. Appl. No. 90/008,375; Patent No. 6,629,135; Apr. 16, 2010.

* cited by examiner



FIG.1



FIG.2



FIG.3



FIG.4

FIG.5



470
HOST ADMIN MENU HostAdmin.asp
DESIGN STOREFRONT WIZARD
605
INTRODUCTION host_setup0.asp
610
615
BEGIN
STEP 1 PROVIDE URL host_setup1.asp
CONTINUE
635
CHANGE
620
STEP 2 CAPTURE HEADER HTML host_setup2.asp.asp
CHANGE
640
CONTINUE
625
CHANGE
645
STEP 3 CAPTURE FOOTER HTML host_setup3.asp.asp
CONTINUE
630
STEP 4 PREVIEW THE DESIGN host_setup4.asp.asp
CONTINUE
650
PREVIEW
655
CONTINUE
PREVIEW STORE (NEW WINDOW) store_preview.asp
680
675
DONE
665
VALIDATE LINKS & IMAGES
STEP 5 FINAL CHECK host_setup5.asp.asp
660
SAVE
xt_SaveStore.asp
670

FIG.6



HOST ADMIN MENU HostAdmin.asp
470
SETUP LINKS
705
710
LIST OF CURRENT MERCHANT LINKS HostMerchantList.asp
735
715
ADD LINK WIZARD NEW MERCHANT
745
REMOVE LINK xt_MaintainHostMerchantLinkt
STEP 1 SELECT/SEARCH CATALOG SelectCatalogSearch.asp
CANCEL
722
EDIT
740
SAVE xt_MaintainHostMerchantLinkt2.asp
SELECT
750
VIEW
728
STEP 2 SELECT A PRODUCT OR CATAGORY BrowseCatalog.asp.asp
BACK
ADD LINK
VIEW/UPDATE LINK NAME MaintainHostMerchantLink2.asp
730
720
SELECT
VIEW Shop.asp
STEP 3 SET LINK ATTRIBUTES SetReferringURL.asp
BACK
755
725
CONTINUE
STEP 4 NAME AND SAVE LINK MaintainHostLink.asp
BACK
760
SAVE xt_MaintainHostMerchantLink.asp
765
STEP 5 COPY AND PASTE LINK href MaintainHostLink.asp
FINISHED
770

FIG.7

Case: 23-1176      Document: 17      Page: 60      Filed: 02/07/2023



FIG.8

Case: 23-1176     Document: 17     Page: 61     Filed: 02/07/2023

NEXCHANGE—MERCHANT MANAGER—UPDATE ACCOUNT—MICROSOFT INTERNET EXPLORER

FILE  EDIT  VIEW  FAVORITES  TOOLS  HELP

BACK  FORWARD  STOP  REFRESH  HOME  SEARCH  FAVORITES  HISTORY  MAIL  PRINT

ADDRESS  http://216.0.58.3/MerchantAdmin/Admin.asp?MerchantID=8861467      GO!   LINKS >>

nexchange™

MERCHANT MANAGER

MAIN  | MANAGE ORDERS | EDIT PRODUCT/CATALOG | GENERATE REPORTS | REVIEW HOSTS | UPDATE ACCOUNT |

QUICK SUMMARY OF RESULTS
SALES TO DATE:      $0.00
SALES THIS MONTH:   $0.00
QUICK REPORT:   THIS MONTH   GO!
SALES ARE GROSS SALES AND DO NOT INCLUDE ADJUSTMENTS

NEXCHANGE NEWS
NEXCHANGE GOES THE EXTRA MILE AND MANAGES EVERY ASPECT OF YOUR AFFILIATE PROGRAM—FROM RECRUITING AFFILIATE WEBSITES AND GIVING THEM TOOLS THEY NEED TO SELL ALL THE WAY THROUGH PAYING THEM MONTHLY SALES COMMISSIONS. WE KEEP IT SIMPLE: YOU PRODUCE GREAT PRODUCTS. WE SELL THEM ALL ACROSS THE INTERNET.
NEXCHANGE GIVES YOU CONTROL.
YOU CHOOSE THE PRODUCT MIX, SET PRICES, AND DESIGN THE ONLINE CATALOG. YOU REACH NEW CUSTOMERS WITHOUT THE TRADITIONAL COSTS OF SALES. NEXCHANGE ONLY EARNS MONEY WHEN WE SELL YOUR PRODUCTS SUCCESSFULLY.

just for feet
WORLD'S LARGEST ATHLETIC SHOE STORE
WHERE THE 13th PAIR IS FREE
JUST FOR FEET

FREQUENTLY ASKED QUESTIONS    CONTACT US

ANNOUNCEMENTS
YOU HAVE 0 NEW ORDERS
YOU HAVE 0 ORDERS TO SHIP
YOU HAVE 0 RETURNS TO PROCESS
NUMBER OF HOSTS IN NETWORK:0
NUMBER OF BUYING 'LINKS':0

INTERNET

FIG.9

Case: 23-1176 Document: 17 Page: 62 Filed: 02/07/2023

NEXCHANGE-HOST MANAGER-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY MAIL PRINT
ADDRESS http://www.nexchange.net/../../HostAdmin/HostAdmin.asp?HostSID=94191470
GO! LINKS
nexchange™
HOST MANAGER
ACCOUNT NO: 238
LEARN2.com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
NEW HOSTS: GETTING STARTED
IT'S EASY TO GET STARTED AS A NEXCHANGE HOST...
1)CLICK THE 'DESIGN YOUR STOREFRONT' BUTTON ABOVE AND FOLLOW THE STEP-BY-STEP INSTRUCTIONS TO CUSTOMIZE THE LOOK AND FEEL OF YOUR ONLINE STORES.
2) CLICK THE 'CREATE ONLINE STORES' BUTTON ABOVE AND THE PRODUCTS TO SELL IN EACH ONLINE STORE (NexShop). SEE BELOW FOR INFORMATION ABOUT THE LATEST CONTEST!
3) CREATE A REASON FOR VISITORS TO VISIT AND BUY FROM YOUR STORES. TRY BANNERS, BUTTONS, TEXT LINKS, OR OTHER IDEAS. CREATE CONTENT THAT WILL EXCITE YOUR VISITORS ABOUT THE PRODUCTS YOU SELL. THE BETTER YOU ARE AT EMBEDDING THE PRODUCTS INTO RELEVANT CONTENT,
QUICK SUMMARY OF RESULTS
COMMISSIONS TO DATE: $7.24
COMMISSIONS THIS MONTH: $0.00
QUICK REPORT: BY MONTH-THIS MONTH GO!
COMMISSIONS ARE GROSS COMMISSIONS AND DO NOT INCLUDE ADJUSTMENTS
DONE
INTERNET

FIG.10

Case: 23-1176    Document: 17    Page: 63    Filed: 02/07/2023



FIG.11



NEXCHANGE-STEP 2-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
nexchange™
HOST MANAGER
ACCOUNT NO: 2765
ABOUT.Com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
STEP 1: PROVIDE URL
STEP 2: CAPTURE HEADER HTML
STEP 3: CAPTURE FOOTER HTML
STEP 4: PREVIEW YOUR NexShop
STEP 5: FINAL CHECK
DESIGN YOUR STOREFRONT
IN STEP 2 AND STEP 3, YOU WILL BE PROVIDING THE HTML CODE (COMPRISING THE TEXT, IMAGES, AND LINKS) THAT WILL APPEAR ON YOUR STOREFRONT. FOR THESE STEPS, YOU WILL NEED TO BE VIEWING THE SOURCE HTML CODE OF THE PAGE YOU ENTERED IN STEP 1.
HERE, WE CAPTURE THE TEXT, IMAGES, AND LINKS THAT YOUR VISITORS WILL SEE ABOVE AND TO THE LEFT OF THE PRODUCTS SOLD IN EACH NexShop. IN THE BOX BELOW, PLEASE PASTE THE HTML CODE OF THE TEXT, IMAGES, AND LINKS TO APPEAR ON THE TOP AND LEFT SIDE OF YOUR STOREFRONT. IF YOUR HTML CODE CONTAINS A BASE TAG, PLEASE REMOVE IT. THEN CLICK THE CONTINUE BUTTON.
<!--TOPINC CODE CREATED BY NESTOR FERNANDEZ-APRIL 21, 1999-:0--
>
<!--SERVER= www.about.com, TMOG=630304865529, MINT=
328829035114348, IN2PID = , IN2ID = NULL, SESSION_ID = 328829035-->
<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 TRANSITIONAL//EN">
<HTML>
<HEAD>
<TITLE> ABOUT.COM- HUMAN GUIDES. HUMAN INTERESTS. EXPERT GUIDANCE FROM HUNDREDS OF GUIDES.</TITLE>
<META NAME="KEYWORDS" CONTENT="GAMES MUSIC TRAVEL SPORTS JOBS FREE STUFF BOOKS SOFTWARE AUCTION CARS CHAT CASINO CITY MAPS ENTERTAINMENT AIRLINES GIFTS JOKES HOTELS FUN CHAT ROOMS HOROSCOPE

FIG.12

NEXCHANGE–STEP 3 – MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
nexchange™
HOST MANAGER
ACCOUNT NO: 2765
ABOUT.Com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
STEP 1: PROVIDE URL
STEP 2: CAPTURE HEADER HTML
STEP 3: CAPTURE FOOTER HTML
STEP 4: PREVIEW YOUR NexShop
STEP 5: FINAL CHECK
DESIGN YOUR STOREFRONT
JUST LIKE IN STEP 2, YOU WILL BE PROVIDING THE HTML CODE (COMPRISING THE TEXT, IMAGES, AND LINKS) THAT WILL APPEAR ON YOUR STOREFRONT. FOR THESE STEPS, YOU WILL NEED TO BE VIEWING THE SOURCE HTML CODE OF THE PAGE YOU ENTERED IN STEP 1.
HERE WE CAPTURE THE TEXT, IMAGES, AND LINKS THAT YOUR VISITORS WILL SEE BELOW AND TO THE RIGHT OF THE PRODUCTS SOLD IN EACH NexShop. IN THE BOX BELOW, PLEASE PASTE THE HTML CODE OF THE TEXT, IMAGES, AND LINKS TO APPEAR ON THE BOTTOM AND RIGHT SIDE OF YOUR STOREFRONT. THEN CLICK THE CONTINUE BUTTON.
</TD>
</TR>
<!--4-->
<TR>
<TD COLSPAN=4 WIDTH=600 ALIGN=CENTER VALIGN=TOP> <BR><FONT FACE="MS SANS SERIF, GENEVA" SIZE=-2>
©<A HREF = "http://home.about.com/gi/pages/mcopyrt.htm">1999</A>
ABOUT.COM, INC. ALL RIGHTS RESERVED.
<BR>
© 1999 ABOUT.COM, INC. "MININGCO.COM" AND "ABOUT.COM" ARE TRADEMARKS OF ABOUT .COM, INC.,<BR> A PUBLICLY TRADED COMPANY LISTED
CONTINUE

FIG.13

NEXCHANGE-STEP 4-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
nexchange™
HOST MANAGER
ACCOUNT NO: 2765
ABOUT.Com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
STEP 1: PROVIDE URL
STEP 2: CAPTURE HEADER HTML
STEP 3: CAPTURE FOOTER HTML
STEP 4: PREVIEW YOUR NexShop
STEP 5: FINAL CHECK
DESIGN YOUR STOREFRONT
YOU'RE ALMOST DONE! CLICK THE PREVIEW BUTTON TO VIEW WHAT THIS STORE WILL LOOK LIKE. A NEW BROWSER WILL OPEN. PLEASE CAREFULLY REVIEW THE TEXT, IMAGES, AND LINKS. IF EVERYTHING IS CORRECT, AND THE SAMPLE "CELEBRATE THE SEASONS" BOOK IS LOCATED IN THE APPROPRIATE PLACE IN THE PAGE, CLOSE THE STORE PREVIEW WINDOW AND CLICK THE CONTINUE BUTTON BELOW.
IF CHANGES NEED TO BE MADE, CLICK ONE OF THE BUTTONS IN THE CENTER COLUMN BELOW, MAKE THE APPROPRIATE CHANGES, THEN CLICK THE CONTINUE BUTTON UNTIL YOU GET BACK TO THIS PAGE. FOR EXAMPLE, IF NONE OF YOUR WEBSITE IMAGES SHOW UP IN THE STORE PREVIEW, CLICK THE CHANGE THE BASE URL BUTTON AND CONFIRM THAT YOU ENTERED A WEBSITE DIRECTORY, NOT A SPECIFIC PAGE (.html). IF YOU WANT TO MAKE CHANGES TO THE DESIGN ABOVE THE "CELEBRATE THE SEASONS" STORE, CLICK THE CHANGE THE HEADER BUTTON
WHEN YOU ARE DONE, CLICK THE CONTINUE BUTTON.
IF YOU WOULD LIKE TO HELP DESIGNING YOUR STOREFRONT, JUST SEND AN EMAIL TO hosthelp@nexchange.com AND WE WILL DESIGN YOUR STOREFRONT FOR FREE. PLEASE INCLUDE YOUR NAME, ACCOUNT NUMBER, AND WEBSITE URL IN THE MESSAGE.
PREVIEW YOUR STOREFRONT, THEN...
CLICK ONE OF THE BUTTONS BELOW TO MAKE CORRECTIONS
OR CLICK BELOW TO CONTINUE
PREVIEW
CHANGE THE BASE URL
CHANGE THE HEADER
CHANGE THE FOOTER
CONTINUE

FIG.14

ABOUT.COM–HUMAN GUIDES. HUMAN INTERESTS. EXPERT GUIDANCE FROM HUNDREDS OF GUIDES.–MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
Current
Sweepstakes
Dads & Grads Golf Outing:
Trip for 2 to Ryder Cup
About.com
Trivia Challenge
Sweepstakes
win a 2000 Jeep Cherokee Sport 4 x 4
enter now!
Find it!
msn
Sidewalk Yellow Pages
About.com
SAT. JUN 12 1999
SEARCH
Join Free
TOP SEARCHES: GENEAOLOGY, CLIP ART
THIS IS ONLY A PREVIEW–SHOPPING IS DISABLED
ABOUT.COM GUIDES ARE REAL PEOPLE
GUIDES IN THE SPOTLIGHT
REAL–TIME NEWS:
GUIDE JACK DOWNS COVERS THE CONS OF INSTANT INFORMATION.
IS MSG SAFE?
NUTRITION GUIDE RICK HALL TAKES A LOOK AT THE FLAVOR ENHANCER.
PLUS
SHAGADELIC STYLE
KNICKS TRIUMPH
HELP FOR PROBLEM DRINKERS
GUIDE OF THE DAY
CAMPING:
GET BACK TO NATURE WITH HELP FROM GUIDE DAVID SWEET.
The Dunwoody Gourmet Group
Safe Shopping By
nexchange
CELEBRATE THE SEASONS!
CELEBRATE THE SEASONS! IS A COOKBOOK FILLED WITH OUTSTANDING SEASONAL MENUS ENJOYED BY THE DUNWOODY GOURMET GROUP, A NEIGHBORHOOD GOURMET GROUP FORMED BY SIX ATLANTA COUPLES OVER 20 YEARS AGO.
CELEBRATE THE SEASONS! FEATURES 20 GOURMET MENUS, EACH WITH SIX COURSES––OVER 165 RECIPES IN ALL!
ORDER YOUR COPY AND START CELEBRATING THE SEASONS WITH YOUR FRIENDS TODAY! FREE SHIPPING IF YOU ORDER 5 OR MORE BOOKS!
Celebrate the Seasons!

FIG.15



NEXCHANGE-STEP 5-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
nexchange™
HOST MANAGER
ACCOUNT NO: 2765
ABOUT.Com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
STEP 1: PROVIDE URL
STEP 2: CAPTURE HEADER HTML
STEP 3: CAPTURE FOOTER HTML
STEP 4: PREVIEW YOUR NexShop
STEP 5: FINAL CHECK
DESIGN YOUR STOREFRONT
IF YOU WOULD LIKE, THE HOST MANAGER SYSTEM WILL VALIDATE THE LINKS AND IMAGES IN YOUR STORE DESIGN. THIS WILL ENSURE THAT YOUR VISITORS WILL BE ABLE TO NAVIGATE WITHIN YOUR STORES AS EASILY AS THEY DO ON YOUR WEBSITE. WE RECOMMEND THAT YOU COMPLETE THIS FINAL STEP.
CLICK THE VALIDATE BUTTON AND THE HOST MANAGER WILL CONFIRM ALL OF THE IMAGES AND LINKS. IF IT FINDS PROBLEMS, THE SYSTEM WILL LIST THEM BELOW FOR YOU TO FIX.
WHEN YOU ARE FINISHED, OR IF YOU WANT TO SKIP THIS STEP, CLICK THE SAVE BUTTON.
VALIDATE
SAVE
LINKS ONLY
IMAGES ONLY
LINKS AND IMAGES

FIG.16

NEXCHANGE--STEP 5-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
nexchange™
HOST MANAGER
ACCOUNT NO: 2765
ABOUT.Com
HOME
DESIGN YOUR STOREFRONT
CREATE ONLINE STORES
VIEW REPORTS
HELP TIPS AND TOOLS
ACCOUNT INFORMATION
STEP 1: PROVIDE URL
STEP 2: CAPTURE HEADER HTML
STEP 3: CAPTURE FOOTER HTML
STEP 4: PREVIEW YOUR NexShop
STEP 5: FINAL CHECK
DESIGN YOUR STOREFRONT
IF YOU WOULD LIKE, THE HOST MANAGER SYSTEM WILL VALIDATE THE LINKS AND IMAGES IN YOUR STORE DESIGN. THIS WILL ENSURE THAT YOUR VISITORS WILL BE ABLE TO NAVIGATE WITHIN YOUR STORES AS EASILY AS THEY DO ON YOUR WEBSITE. WE RECOMMEND THAT YOU COMPLETE THIS FINAL STEP.
CLICK THE VALIDATE BUTTON AND THE HOST MANAGER WILL CONFIRM ALL OF THE IMAGES AND LINKS. IF IT FINDS PROBLEMS, THE SYSTEM WILL LIST THEM BELOW FOR YOU TO FIX.
WHEN YOU ARE FINISHED, OR IF YOU WANT TO SKIP THIS STEP, CLICK THE SAVE BUTTON.
IMAGE VALIDATION STATUS
VERIFYING IMAGE: 011
VALID: 011
INVALID: 000
LINK VALIDATION STATUS
VERIFYING LINK: 028
VALID: 028
INVALID: 000
VALIDATE
SAVE
LINKS ONLY
IMAGES ONLY
LINKS AND IMAGES

FIG. 17

Case: 23-1176     Document: 17     Page: 70     Filed: 02/07/2023



FIG.18

CULINARY CAFÉ–COOKING FOR YOU–MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
LINKS >>
Culinary Café
RECIPES
APPETIZERS
BARBECUE–GRILLING
BEANS–GRAINS
BREADS–BISCUITS
CANDY–SNACKS
CASSEROLES
COOKIES–BROWNIES
CROCK POT
DESSERTS
DRINKS
ETHNIC DISHES
EGGS–DAIRY
FRUITS
GARLIC
HOLIDAY FAVORITES
LOW CARB
MEAT DISHES
PANCAKES–MUFFINS
PASTA
PIES–PASTRIES
PIZZA
SALADS
SANDWICHES
SAUCES–MARINADES
SEAFOOD–FISH
SIDE DISHES
SOUPS–STEWS
VEGETABLES
VEGETARIAN
SEARCH
You can save money on your favorite grocery brands each week!
go
Culinary Café
FANCY FOODS GOURMET CLUB
Safe Shopping By
nexchange
PRODUCT CATEGORIES:
CHOCOLATE
SPREADS AND ASSOCIATED PRODUCTS
SEAFOOD AND ASSOCIATED PRODUCTS
GIFT BASKETS
CONDIMENTS
OTHER PRODUCTS
FEATURED ITEM
FFGC SUPER SAMPLER GIFT SET
$62.50 TO $77.00
TELL ME MORE
ADD TO CART
LOOK FOR OTHER PRODUCTS OFFERED BY FANCY FOODS GOURMET CLUB
PRODUCT LOCATOR:
FIND IT
EXIT STORE
Safe Shopping

FIG.19

NEXCHANGE-SYSTEM MANAGER-MAIN-MICROSOFT INTERNET EXPLORER
FILE EDIT VIEW FAVORITES TOOLS HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY MAIL PRINT
ADDRESS http://www.nexchange.net/NexchangeAdmin/NexchangeAdmin.asp?NexchangeSID=94191470
GO! LINKS >>
nexchange™
SYSTEM MANAGER
9/16/99 2:06:46 PM
MAIN UTILITIES HOSTS MERCHANTS AGENTS FINANCE
SHOPPING STATISTICS
PENDING ORDERS: 1
TOTAL SESSIONS: 361056
TOTAL ORDERS: 349
TOTAL SALES: $23,370.09
HOST STATISTICS
TOTAL HOSTS: 6234
PENDING: 6
APPROVED: 5095
DECLINED: 1133
TOTAL COMMISSIONS: $3,235.60
MERCHANT STATISTICS
MERCHANTS: 17
HOST RELATIONSHIPS: 10761
LINKS: 22713
REVENUE: $16,188.74
UNTENDED ORDERS
GATEWAY LEARNING CORPORATION 1512 9/12/99 3:07:36 PM OK
MPC MARKETING, INC. 1468 9/2/99 5:08:19 PM OK
MPC MARKETING, INC. 1469 9/2/99 6:29:06 PM OK
MPC MARKETING, INC. 1478 9/4/99 4:48:16 PM OK
MPC MARKETING, INC. 1480 9/4/99 8:32:31 PM OK
MPC MARKETING, INC. 1482 9/5/99 11:31:36 AM OK
MPC MARKETING, INC. 1486 9/7/99 10:16:18 AM OK
MPC MARKETING, INC. 1501 9/9/99 11:56:57 PM OK
MPC MARKETING, INC. 1507 9/11/99 9:24:40 PM OK
MPC MARKETING, INC. 1509 9/12/99 9:10:56 AM OK
RETURNS
NEW:3
CANCELED: 2
RETURNED: 4
DONE
INTERNET

FIG.20



FIG.21

HOST WEB PAGE WITH COMMERCE OBJECT LINK
2200
LINK ERROR
LINK ERROR LinkError.asp
2205
SESSION ERROR SessionError.asp
2215
FROM ANY PAGE
2210
SHOPPING PAGE Shop.asp
ADD TO CART xt_ProcessAdd.asp
2212
SEARCH PRODUCTS
PRODUCT SEARCH DisplaySearch.asp
2240
SEARCH AGAIN
NAVIGATE CATALOG
2230
VIEW ABOUT INFO
VIEW ABOUT INFORMATION
2222
VIEW MERCHANT
VIEW MERCHANT INFORMATION MerchantInfo.asp
2224
VIEW SHOPPING CART
VIEW SHOPPING CART ShoppingCart.asp
2250
UPDATE QUANTITIES xt_EditShoppingCart.asp
CHECK OUT
2260
BILLING INFORMATION Checkout_Billing.asp SSL
2262
SHIPPING INFORMATION Checkout_Shipping.asp SSL
2264
CONFIRM CHECKOUT INFORMATION Checkout_Confirm.asp SSL
2266
GENERATE ORDER xt_Checkout.asp SSL
2268
DISPLAY RECEIPT Confirm.asp SSL
SECURITY STATEMENT SecurityInfo.asp
2228
PRIVACY STATEMENT PrivacyInfo.asp
2226
FROM ANY PAGE
FROM ANY PAGE

FIG.22

MERCHANT MANAGER Admin.asp
2300
MAINTAIN ACCOUNT INFORMATION
2305
MAINTAIN BASIC INFORMATION MerchantBasics.asp
2310
SAVE MerchantBasics_xl.asp
MAINTAIN SHIPPING OPTION ShippingOption.asp
2350
SAVE ShippingOption_xl.asp
MAINTAIN SHIPPING TABLE ShippingTable.asp
2360
SAVE ShippingTable_xl.asp
MAINTAIN TAX SCHEDULE TaxSchedule.asp
2370
SAVE TaxSchedule_xl.asp
MAINTAIN MERCHANT CONTACTS MerchantContacts.asp
2320
SAVE MerchantContacts_xl.asp
MAINTAIN PRODUCT DEFAULTS ProductDefaults.asp
2330
SAVE ProductDefaults_xl.asp
MAINTAIN PAYMENT INFORMATION MerchantPayment.asp
2340
SAVE MerchantPayment_xl.asp

FIG.23

MERCHANT MANAGER
2300
MANAGE CATALOG AND CATEGORIES ManageCatalog.asp
2440
CATALOG NAVIGATION
2444
ADD/EDIT/ REMOVE
MAINTAIN CATALOG/CATEGORY MaintainCategory.asp
2450
SAVE xl_MaintainCategory.asp
2455
BY CATALOG
2442
SELECT
CRITERIA
2405
EDIT PRODUCTS & CATALOGS ProductList.asp
2400
EDIT
MAINTAIN PRODUCT MaintainProduct.asp
2420
SAVE
2422
ADD ATTRIBUTE
2426
CREATE A NEW ATTRIBUTE AddAttribute.asp
2428
SAVE xl_MaintainProductAttribute
SELECT
ADD/EDIT/REMOVE ATTRIBUTES MaintainProductAttribute.asp
2430
SAVE OR CANCEL xl_MaintainProductAttribute
2435
VIEW
VIEW PRODUCT AS IN STORE ShowProduct.asp
2410
VIEW PRODUCT ADDITIONAL INFORMATION ShowAddInfo.asp
2415

FIG. 24



FIG.25

Case 1:17-cv-Case928-RCLH Document 178-1 Filed 07/05/10 Filed: 02/07/2028345 PageID #:
2053



FIG.26

US 7,818,399 B1

**1**

## METHODS OF EXPANDING COMMERCIAL OPPORTUNITIES FOR INTERNET WEBSITES THROUGH COORDINATED OFFSITE MARKETING

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of application Ser. No. 10/461,997, filed Jun. 11, 2003, now U.S. Pat. No. 6,993,572, which is a continuation of application Ser. No. 09/398,268, filed Sep. 17, 1999, now U.S. Pat. No. 6,629,135, which claims the benefit of application Ser. No. 60/100,697, filed Sep. 17, 1998, which applications are hereby incorporated by reference.

### BACKGROUND OF INVENTION

1. Field of Invention

The invention relates to a system and method supporting commerce syndication. More specifically, the invention relates to a system and method for computer based information providers to receive outsourced electronic commerce facilities in a context sensitive, transparent manner.

2. Description of Prior Art

The World Wide Web began as a simple interface to the Internet using HTML (hypertext markup language) as a means of linking documents together. This allowed a researcher, for example, to embed "active" references in his or her documents that, if selected, would enable the reader to review the source of the reference first-hand. Programmers quickly capitalized on this technology, creating "web sites" which reflected less staid purposes, laying the groundwork for the literal "web" of content and interactive applications that exists today. In the early stages, website programmers increased visitor traffic by placing "links" within their websites to other websites, usually related in content or function, in exchange for a reciprocal link. Additionally, directories of websites, such as Yahoo, and search engines, such as Web-Crawler, began to appear in an attempt to organize the content of the Internet so that its users could create "custom links pages" related to specific topics.

In these early days, the Web was mostly trafficked by programmers and "techies," and a commune-type "share and share alike" mindset prevailed. As a result, people were happy to litter their sites with links, knowing that, odds were, others would do the same for them and the traffic gain/loss would probably balance out. So, despite the fact that by including and promoting a "links" page, website operators were effectively encouraging people to leave their website, link sharing developed into a standard practice.

Then, entrepreneurs and other business-oriented individuals came along and introduced capitalism to the Internet. Profit-oriented website operators began to seek visitors wherever they could find them, and opportunistic owners of popular sites began to realize that they had an increasingly scarce resource—visitors. Such website owners began to sell the links they had previously offered for free in the form of paid advertisements. Search engines and directories became increasingly popular for two main reasons. First, the number of websites was growing astronomically, so it was becoming harder for users to find what they wanted. Second, since reciprocal links were either going away or were being replaced by links exclusively to non-competing websites, search engines and directories were the only way to find multiple resources for a single topic.

**2**

Amid frantic efforts on the part of corporate websites to get noticed, the sale of banner ads blossomed into a large industry called Internet advertising. Thousands of websites created space for banner ads and called the space "inventory." At first, they priced ads as a print ad might be priced: by CPM, or cost per thousand "impressions" each ad made on website visitors. Over time this pricing model gave way to arrangements more favorable to advertisers such as Cost Per Click-through and Cost Per Inquiry (meaning the advertiser only needs to pay when a visitor sees a banner ad and clicks on it and completes an information request form on the advertiser's site).

Some of the most successful Internet commerce websites, led by online bookseller Amazon.com, have begun to take an even more results-driven approach to the purchase of banner ads. They have offered to pay only for ads that, when clicked, result in a product sale. To provide a stronger incentive than a simple banner ad, these companies let third-party website owners list a subset of their goods (e.g., 10 of Amazon.com's millions of books, selected by the website owner) and promote them as they choose within their websites. Initiatives such as these have come to be described as "affiliate programs", "associate programs" or "commission based advertising programs".

The benefits of affiliate programs are significant. To the website owner, they constitute revenue-generating web content without requiring an investment in product inventory or additional infrastructure. They also create new revenues without necessarily reducing the website's available ad inventory. However, the greater benefit almost always accrues not to the affiliate, but to Amazon.com and other online stores. Not only do these sites benefit from the marketing resources of the affiliate operators, they are also able to lure the visitor traffic away from the affiliate. Once a visitor clicks on an affiliate ad and enters an online store, that visitor has left the affiliate's site and is gone. At best, affiliates are able to use "frames" to keep a shell of their own website around the vendor's site, but this is only a marginally effective solution. No alternatives have been able to address a fundamental drawback of the affiliate programs—the loss of the visitor to the vendor. At best, some Internet affiliate sales vendors have begun placing "return to referring website" links on their order confirmation screens, an approach that is largely ineffective. This limitation of an affiliate program restricts participation to less trafficked websites that are unconcerned about losing visitors. Meanwhile, search engines and directories continue to increase in their usefulness and popularity, while banner ads and old-style links continue their rapid loss of effectiveness and popular usage.

The present invention overcomes these limitation of present affiliate commerce systems and provides other benefits as will become clearer to those skilled in the art from the foregoing description.

### SUMMARY OF THE INVENTION

The affiliate commerce system and method of the present invention represents a new paradigm of co-marketing on the Internet. Not only does the present invention provide its Hosts with the added value and incremental revenues of traditional affiliate programs, but the company also enables Hosts to control the customer experience before, during, and after the purchase transaction. At the same time, Merchants receive the same benefits as with older affiliate programs, i.e., increased marketing potential, incremental sales, and new customer relationships, but without the restrictive limitations of affiliate programs—the loss of hard-won visitor traffic.

3

Additionally, the present invention can actually obviate the need for some merchants to invest in their own unique Internet presence. By using the present invention as their primary online sales channel, these Merchants can focus on product development, production, and order fulfillment and leave the exploration of the Internet to experts. The resulting ongoing cost savings and operational efficiencies magnify the potential benefits of the Internet while reducing the initial costs.

According to the present invention the look and feel of each participating Host is captured and stored. Hosts may include links to selected products or product categories within pages residing on the Hosts' website. Upon actuation of such a link by a visitor of the Host website, a page is presented to the visitor incorporating a replica of the Host's look and feel directed to the sale of the selected products or product categories.

The look and feel of a host is captured and stored by receiving an identification of an example page of a target host. The identified page is retrieved. The look and feel elements of the page are identified, and these elements are stored for future use in generating outsourced transparent pages, pages served by a server other than the host but with the host's look and feel. Such pages give the viewer of the page the impression that she is viewing pages served by the host.

The links included by the host directed to the outsource provider need not be statically linked to a particular product or product category. Such links may direct the outsource provider to dynamically select content to serve within the host's look and feel. This content may be selected based upon a contextual analysis of the page which includes the link. Further, the dynamic content need not be limited to products or product categories but may include any content within the system's data store that is amenable to contextual correlation with content in the page containing the link.

A cost effective, scalable architecture may be used to serve dynamically constructed pages such as those served by the e-commerce outsource provider. This architecture includes three levels: a Web server layer, an application server layer and a database server layer.

The Web server layer provides a front end presentation layer for interacting with end users. This layer may consist of one or more interchangeable low cost server systems. Any request from an end user may be fielded by any system within the layer. The selected system can contact any application server within the application layer to provide processed data for use in responding to the end user request.

The application layer supports with the database server level to acquire needed data and processing it prior to presentation by the Web server layer. As with the Web server layer, this layer may consist of one or more interchangeable low cost server systems. Any Web server system may submit a request to any application server. The application server includes processing functionality suitable for the types of pages to be dynamically constructed.

The database server layer supports low level management of data used in dynamic page construction. The data store across the one or more low cost server systems is seamlessly viewed as an integrated whole. As a consequence, any database server within the layer can field any request for data submitted by an application server.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts a typical hardware architecture implementing the present invention.

FIG. **2** illustrates the software architecture of the Web server layer.

4

FIG. **3** illustrates the software architecture of the application server layer.

FIG. **4** is a flow chart of the pages and procedures in the host signup process.

FIG. **5** is a flow chart of the pages and procedures in the host account information maintenance process.

FIG. **6** is a flow chart of the pages and procedures in the host look and fee capture process.

FIG. **7** is a flow chart of the pages and procedures in the host link generation process.

FIG. **8** is a flow chart of the dynamic content selection and presentation process.

FIG. **9** is a screen capture of a Merchant Manager page in a preferred embodiment.

FIG. **10** is a screen capture of a Host Manager page in a preferred embodiment.

FIGS. **11-18** are screen captures of the page in a preferred embodiment of a look and feel capture process.

FIG. **19** is a screen capture of a typical e-commerce supported page served in a preferred embodiment.

FIG. **20** is a screen capture of a System Manager page in a preferred embodiment.

FIG. **21** is a flow chart of the pages and procedures in the host view reports process.

FIG. **22** is a flow chart of the pages and procedures in the shopping process.

FIG. **23** is a flow chart of the pages and procedures in the merchant account maintenance process.

FIG. **24** is a flow chart of the pages and procedures in the merchant catalog maintenance process.

FIG. **25** is a flow chart of the pages and procedures in the merchant view reports process.

FIG. **26** is a flow chart of the pages and procedures in the merchant view hosts process.

DETAILED DESCRIPTION OF THE INVENTION

A preferred embodiment of the invention is now described in detail. Referring to the drawings, like numbers indicate like parts throughout the views. As used in the description herein and throughout the claims that follow, the meaning of "a," "an," and "the" includes plural reference unless the context clearly dictates otherwise. Also, as used in the description herein and throughout the claims that follow, the meaning of "in" includes "in" and "on" unless the context clearly dictates otherwise.

A typical embodiment of the present invention will include a data store including a look and feel description associated with a host website, a communications link to a visitor computer, and a processor. The processor performs the tasks of capturing a look and feel description associated with a host website, storing the captured look and feel description in the data store, providing the host website with a link that link correlates the host website with a commerce object for inclusion within a page on the host website and which, when activated, causes the processor to serve an e-commerce supported page via the communication link with a look and feel corresponding to the captured look and feel description of the host website associated with the provided link and with content based on the commerce object associated with the provided link. The Internet serves as the communication link to visitor computers.

In a preferred embodiment as exhibited by FIG. **1**, the duties of the processor are split among several computer systems 120*a*-120*c*, 125*a*-125*d*, 130*a*-130*b*. The data store may be implemented through a database system 130*a*-130*b*, 135*a*-135*d*. The Internet **110** serves as the communication

US 7,818,399 B1

5

link to visitor computers 105a-105f. In this preferred embodiment, the system utilizes multiple inexpensive computer systems at every level of the architecture. Routing between levels will automatically distribute the load amongst the functioning computers. Increasing throughput becomes a matter of adding more computers, not scaling up the existing ones. This arrangement also provides fault tolerance since the failure of one server will not incapacitate the system as long as another server providing the same service is alive. This approach also permits the distribution of servers geographically. A router 115 may also provide further load balancing.

The tasks performed by the processor may utilize a variety of underlying software technology. In a preferred embodiment, the software architecture can be divided into 3 tiers: web server, application-server and database-server. Each tier is comprised of a number of software layers.

Web Server Tier

The Web Server tier accesses application functionality by calling a single "Request" Application Programming Interface (API). The API will take a Document Object Model (DOM) (as specified by W3C in http://www.w3.org/TR/REC-DOM-Level-1, which is expressly incorporated herein by reference in its entirety) object as a parameter and return a DOM object as the response. The request will be relayed to the application server tier where a dispatching method will unpack the request object, inspect it, invoke the desired method, and send back the response object. This approach means that new functionality becomes available as soon as the application server is upgraded. It is not necessary to develop a set of "stubs" that mirror the new API call. This is a major advantage because new functionality in the application tier can be exploited immediately simply by modifying the Active Server Page (ASP) scripts. No web server resident Dynamic Link Libraries (DLLs) need to be upgraded so the server does not need to be shut down. The web server tier will typically run on server computers 120a-120c having a multitasking operating system such as Windows NT from Microsoft or other suitable operating system software. The Web Server tier contains the following layers as illustrated in FIG. 2:

Web Server Software 210. In a preferred embodiment, IIS by Microsoft is the server software. It supports serving side scripting using the VBScript scripting language.

ASP Scripts 220. All HTML content is rendered by ASP server scripts. The ASP scripting environment can interact with software modules written to Microsoft's COM specification.

COM Adapters 230. A set of COM wrappers provides the bridge between the ASP scripts and other elements of the system. The wrappers provide the necessary data conversions but do not contain any substantial functionality. The wrappers are not application specific.

API Client Layer 240. The API Client Layer consists of the very thin "request" API described above. This layer cooperates with the Object Cache layer. For example, before retrieving a catalog from the application layer, this layer may check to see if the requested catalog is already in the object cache.

Object Cache 250. The object cache contains the responses to previously submitted requests. All items in the cache are marked with an expiration time that is set at the time they are originally retrieved. The purpose of this layer is to reduce the load on the application tier.

Remote Procedure Call Client 260. The Remote Procedure Call Client provides connectivity to the application tier. It also provides request routing. In the event of application server failure, this client will automatically reconnect to a working server. This piece of software is not application dependent. In a preferred embodiment, the

6

DBMS Component Server Client is the Objectstore Component Server Client (OCSC).

In a preferred embodiment, the Web server layer supports the following four Web interface modules. In a preferred embodiment, these modules are encoded with ASP to generate appropriate HTML and Javascript. The four modules are as follows:

1. Merchant Manager

The Merchant Manager is the "Control Center" for Merchants. This module allows the merchant to maintain their products, catalogs, contact information, track orders, process returns, run reports, etc.

A merchant representative must login before performing any system activities. Any valid merchant user will be able to perform all possible actions on the merchant to which it is related. Only registered merchants will have a valid account. An account for a merchant is established when the merchant registers with the system. A merchant representative may initiate registration via a web interface. The signup process must collect basic merchant information, including the information necessary to pay the merchant, and a password, which will be used to create a user account for the merchant. Once the merchant is approved (this may be automatic), the merchant will be sent an email containing a unique user id which can be used to login to the system.

When a representative logs in, she is taken directly to the Merchant Manager as seen in FIG. 9 and assigned a Merchant Session ID (Merchant SID). All pages within the merchant system must retrieve the MerchantSID from the HTTP request and validate it. If the session does not validate, the representative is taken back to the Login screen.

This module contains the following submodules:

Account Information

A merchant representative will be able to maintain the basic merchant profile, which includes the information needed to pay the merchant, the merchant's password, and the merchant's shipping policy information. FIG. 23 depicts the pages and procedures in a typical merchant account maintenance process. The representative selects to maintain account information 2305 from the Merchant Manager page 2300 leading to the display of the a basic information modification page 2310. Each modifiable information type could be altered through a designated page available through the basic information page 2310. Each such page could provide functionality to save any changes made to the particular page.

This sub-module allows a merchant to maintain the following types of information:

Basic information 2310—name, description, address, logo

Contacts 2320—for admin, finance, returns, support, order notification

Product Defaults 2330—price labels, unit of weight, display options

Payment info 2340—check or ACH, payee info, bank info

Shipping Option 2350—by price, items, weight, other or NA

Shipping Table 2360—maintain shipping methods and prices

Tax Schedule 2370—set tax rate for states in which taxes are collected. This may be automated in the future.

Products and Catalogs

Here the merchant can both maintain products and arrange them into catalogs. Example product attributes include:

name

description

attributes—such as size, color, etc.

US 7,818,399 B1

7

price(s)—normal, sale, competitor's and the price can be set or changed by an attribute

small image—used in most places

large image—used for zoom-in in shopping

The merchant can also maintain their catalogs and categories. A catalog is the top level category. A merchant can have one or more catalogs. Each catalog will be presented to Hosts as a separate entity. However, it is still tied back to the merchant. The merchant logo can be assigned to the catalog or a different image selected.

A catalog is considered a commerce object. Further, a catalog is populated with product or product category commerce objects. An indicator for dynamic selection of a product or product category may also be considered a commerce objects; however, such objects would not appear in a catalog.

Categories are then placed in the catalog(s). Categories can also be placed into other categories. A catalog or category can contain an infinite number of categories but really should be kept to less than 10 at any given level for presentation purposes. The bottom level categories contain products. The product node is actually a pointer to the product in the inventory table. This allows for a product to be placed into multiple categories.

A catalog, category or a product can be set to be inactive. If it is set as inactive, it will not be available to the hosts to browse or sell. It will also not be available to customers in the shopping area. If a catalog or category is set as inactive, then every item beneath it (categories or products) is also inactive.

A product also has a flag to indicate it is out of stock. When a product is no longer going to be sold by the merchant, it should be set to inactive. If the product is simply out of stock, thus temporarily unavailable, the out of stock flag should be used.

If a host has an existing link that points to an inactive or out of stock product or an inactive catalog or category, the customer will be taken to the first level above that is active. For example, if a customer clicks on a Link that points to coffee pot A, and coffee pot A has been set to inactive, the shopping page will display the entire coffee pot category (all the active coffee pots). If the coffee pot category was set to inactive, then the shopping page would go to the next level up (such as Kitchen Appliances). In this case the shopper will be given a message indicating the selected product or category is not available. If a host has a link associated with a dynamic selection indicator commerce object, the triggering of such a link will cause the dynamic selection of a product or product category.

FIG. 24 depicts pages and procedures used in a merchant catalog and product maintenance process. When a merchant representative logs into the system, she is presented with the merchant manager page 2300. From this page, she may choose to proceed to the edit products and catalogs page 2400. On this page, she may elect to search for a product through entering criteria 2405. She may elect to preview a particular product 2410 and, from the preview, view additional information associated with the particular product 2415.

From the edit products and catalogs page 2400, she may also choose to edit a particular product 2420 or edit by catalog or category 2442. In editing a particular product 2420, she may elect to save the information associated with the product 2422, select a current attribute to edit 2424 leading to the attribute edit page 2430 or create a new attribute associated with the product 2426. An

8

attribute includes a collection of options such as sizes or colors. If she selects to add a new attribute 2426, a new attribute creation page is presented 2428. Upon creation of the new attribute, the new attribute is saved, and the representative proceeds to the attribute edit page 2430. From this page, she may choose to save or cancel the current attribute edit 2435.

If the representative chooses to edit by catalog or category 2442, she is presented a page allowing selection of catalogs or categories 2440 through navigating the catalog/category hierarchies 2444. Once a particular catalog or category is identified, she may edit it via a catalog/category edit page 2450. After editing, the alterations are saved 2455 returning her to the catalog or category selection page 2440.

Reports

A merchant representative may request on-demand reports. Such reports include an account statement that details all payments to the merchant, and statistics about catalog visits and sales. Statistics can be correlated to hosts, links, products and time periods.

As illustrated in FIG. 25, a merchant representative begins at the Merchant Manager page 2300. She selects the view reports option 2505 to view the report menu page 2510. From the reports menu page 2510, she may enter criteria 2514, 2518 leading respectively to a revenue summary page 2520 or a monthly statement page 2530. From the monthly statement page 2530, she may change criteria 2535 to view a revised monthly statement 2530 or return to the report menu 2510. From the revenue summary page 2520, she may select a specific item 2525 for receiving a detailed revenue page 2550, alter the criteria 2527 to receive a revised revenue summary 2520, or return to the reports menu page 2510. From the detailed revenue page 2550, she may return to the revenue summary page 2520.

The following reports are available for the merchants to track their results:

Revenue Summary by Month

This report provides sales and traffic information summarized by month. Data includes number of sessions, number of orders, gross and net sales, etc. Summarizes at the month level and allows 'Drill Down' to daily information.

Revenue Summary by Host

This report provides sales and traffic information summarized by host. Data includes number of sessions, number of orders, gross and net sales, etc.

Revenue Summary by Product

This report provides sales and traffic information summarized by Product. Data includes number of sessions, quantity in shopping cart and gross order amount.

All reports can be run as quick reports (this month, last month, this year, last year, all sales) or by inputting a specific date range.

Order Tracking

A merchant representative can access a web interface that allows her to report the status of orders. This includes: reporting when the order was shipped, along with tracking information, and the status of all returned items.

The order tracking sub-module allows the merchant to manage all areas of an order. An order can have the following status:

new—the order has been received and credit card information validated

US 7,818,399 B1

9

pending—the merchant has acknowledged the order, it is waiting to be shipped

shipped—the merchant has shipped the order

An order can be shipped in multiple shipments. The merchant is credited for sales on shipped items.

The customer may also return part of an order or the entire order. The customer will obtain an RMA number (see the Shopping sub-module). All the merchant needs to do is acknowledge they have received the product back from the customer.

Review Hosts

The Merchant Manager also allows the merchant to review which hosts have built links to that merchant's products. The merchant can also view the host web page containing such links.

A merchant representative will be able to review the list of hosts with which the merchant has a relationship. The merchant will have access to some basic information about the host, including at least one of the host's links, so that the host's look and feel can be evaluated.

In a preferred embodiment, a representative may review hosts through pages and procedures as depicted in FIG. **26**. She begins at the Merchant Manager page **2300**. She selects the review hosts option to view the merchant-host relationship page **2600**. From this page, she may elect to view one of her products in the host's look and feel **2610** or view a list of links with the selected host that are directed to her commerce objects **2620**.

Automated interfaces can be introduced for merchants wishing to integrate their business systems with the functionality supported by the present inventions. Merchants can update their online catalogs, retrieve information on orders placed, and send order status updates back via automated interfaces. This integration is accomplished through the establishment and use of a standardized communication protocol.

In a preferred embodiment, merchants integrate by exchanging specially formatted XML documents over secure HTTP connections (i.e. HTTP over SSL). If the request is a query, the HTTP response will contain an XML document with the query results. Likewise, if the request is a command, the response will be an XML document containing the success or failure of the command.

Automated requests and responses are XML documents as described by the W3C's XML 1.0 specification, which may be found at http://www.w3.org/TR/REC-xml and which is expressly incorporated herein by reference in its entirety. The XML specification only describes the syntax of an XML document, it does not place any restrictions on the content of the document. The content of requests and responses is described using a formal notation known as DCD (for Document Description). DCD's are described in a note that was submitted to the W3C by Microsoft and IBM. The DCD note can be viewed online at: http://www.w3.org/TR/NOTE-dcd and which is expressly incorporated herein by reference in its entirety. A specific DCD describes the format of a request or response in the same way that the SMTP specification describes the format of an email. Typical DCDs for Automated Interfaces may be accessed at the following URLS: http://automation.nexchange.net/dcd/ManageInventory.01.02.dcd.xml and http://automation.nexchange.net/dcd/Manage-Catalog.01.02.dcd.xml, both documents are expressly incorporated herein by reference in their entirety.

10

All interfaces have the same basic structure. The table below illustrates the basic structure of Automated Interface requests and responses.

```
<ManageOrders
specification='http://www.nexchange.net/automated/xml/ManageOrders.
01.01.dcd'>
                         HEADER
  <RequestHeader
Response
     <Authentication
        username='xxx'
        password='xxx'
        scope='xxx'
     />
     <Instructions OnFail='HALT'/>
     <Receipt Processor='xxx' Date='xxx' Number='xxx'/>
     <ResponseSummary Status='SUCCESS'>
        Error Message Here
     </ResponseSummary>
  </RequestHeader>
                          BODY
  <RequestBody>
Query
        <Command status='SUCCESS'>
           <QueryNewOrders/>
query
           <QueryNewOrdersResponse>
              Query Results Here
           </QueryNewOrdersResponse>
        </Command>
Operation
        <Command status='SUCCESS'>
           <AcknowledgeOrder order_id='xxx'
item_price_total='xxx'/>
        </Command>
  </RequestBody>
</ManageOrders>
```

All responses contain the original request with status information and query results appended. The table above shows a response to a Manage Orders request. The response is divided into a header and a body section ("RequestHeader" & "RequestBody" respectively).

The RequestHeader element contains authentication information and global instructions. When the request is returned, the request header will also contain a receipt and a response summary. The authentication element carries the information needed to identify and authenticate the requesting party. The global instruction element contains instruction on how the request is to processed if an error is received. The remainder of the commands in the request can be processed or the request can be discontinued. In a response, the receipt element is added to the request header. Information in the receipt can be used to recover the response. The response summary element contains a status code, which will be set to "SUCCESS" if all commands were completed successfully.

The RequestBody element contains one or more command elements. The exact content of a command element depends on the interface being used. When a command is submitted, its status attribute will always be "REQUESTED". When the command has been processed, the response will echo back the command with the status changed to "SUCCESS", "FAILURE" or "SKIP". In the case of a query command, the response will contain a query response in addition to the status.

If the request conforms to the DCD, the response will contain the original request with the status and query

**11**

results embedded. The command status codes must be inspected to determine what has been done.

If the request did not conform to the specification, two possible error types can occur:

XML Parsing Error

DCD Validating Error

Errors are returned as NexError node. If a NexError is returned, the XML document has not been processed. The returned XML should always be examined for a NexError.

If the request document is not valid XML, an XML Parsing Error will be returned. A NexError node will be added around the entire document. It will look similar to the following:

```
<NexError Msg="XML Parsing Error" . . . >
   <XMLParseError errorcode=" " reason=" " line=" " line-
pos=" ">
      offending section of document
   </XMLParseError>

</NexError>
```

The errorcode, reason, line and linepos will contain information explaining what the error is and the location in the file.

If the request document is valid XML but does not match the published Interface DCD, a DCD Validating Error will be returned. A NexError node will be added around the entire document. A DCDError node will be embedded in the document at the location of the error. It will look similar to the following:

```
<NexError Msg="XML Validating Error" . . . >
   <XMLValidateError msg="Find the DCDError Node in
the document for detailed error information."/>
      . . . Valid Portion of document . . . .
   <DCDError message=" ">
      offending section of document
   </DCDError>
      . . . Valid Portion of document . . .
   </XMLValidateError>

</NexError>
```

The following is an example request attempt to add one new product and to update the price of an existing product.

```
<ManageInventory
specification='http://automation.nexchange.net/dcd/Manage
Inventory.01.02.dcd.xml'>
   <RequestHeader>
      <Authentication username='xxxxx'
password='xxxx' scope='MNNN'/>
      <Instructions onfail='CONTINUE'/>
   </RequestHeader>
   <RequestBody>
      <Command status='REQUESTED'>
         <AddProductDef updateifexists='1'>
            <ProductDef
               id='saw'
               skumask='saw'
               name='saw'
         description='A Circular Saw From Festo'
         shortdescription='Festo Circular Saw'
            info='no comment'
         image='http://216.0.58.242/rmtools/fw132saw.jpg'
      largeimage='http://216.0.58.242/rmtools/fw132saw.jpg'
               usualprice='145.00'
               saleprice='135.00'
               compareprice='215.00'
               salelabel='HOT PRICE'
```

**12**

-continued

```
               instock='1'
               commplan='default'
            >
               <AttributeDefList/>
               <KeywordList/>
            </ProductDef>
         </AddProductDef>
      </Command>
      <Command status='REQUESTED'>
         <UpdateProductDef
            id='saw'
         image='http://216.0.58.242/rmtools/fw132saw.jpg'
            />
      </Command>
   </RequestBody>
</ManageInventory>
```

**2. Host Manager**

The Host Manager is the "Control Center" for Hosts. Here, a Host can track sales, design their store front, generate links to merchant products, get traffic/order reports, update account information, etc

For a host to gain access to the host manager system, the host must be registered. FIG. 4 depicts a flow chart for a typical registration process. A host representative may initiate contact 410 with the system via a web interface. The signup process must collect basic host information 420, including the information necessary to pay the host a commission for purchases through his site, which is saved by the system 430. Optionally, a click agreement containing terms of use 440 may be presented requiring agreement 444 to proceed. If at some point the representative elects to cancel 425, 458 or reject the use agreement 448, he or she is returned to her point of entry 410. The system may then request the representative to select a user identification and a password 450. If the selected user identification is already in use 454, the representative may be prompted to select a user identification 450. The information associated with the host is stored 460, and the representative may proceed to the host manager system page 470.

When a host logs in, they are taken directly to the Host Manager, as seen in FIG. 10, and assigned a Host Session ID (Host SID). All pages within the host system must request the Host Sid and call the ValidateHostSessionID function. If the session does not validate, the user is taken back to the Login screen.

This module contains the following submodules:

Account Information

This sub-module allows a host to maintain the following types of information:

Administrative Contact—name, address, phone

Payee Contact—name, address, phone, SSN

Site Information—site name, URL, description

Site Demographics—# of visitors, type of visitors, comments

A host representative will be able to maintain basic host information, including the information needed to pay the host, and the host's password. FIG. 5 depicts a flow chart of the pages and actions in a typical maintenance process. The representative has previously logged into the system to reach the host manager system page 470. From the host manager system, the representative selects to update her account 510 leading to a host information maintenance page 520. The representative can modify host information and, then choose to save or

US 7,818,399 B1

13

cancel the modification **530**. In either case, the representative is returned to the host manger system page **470**.

Store Front Design

The store front design is where the host's look and feel is captured. The look and feel is captured by selecting an example page the host, retrieving the sample page from the host, identifying the look and feel elements from the sample page and saving the identified look and feel elements. "Look and feel elements" include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or other elements that are consistent through some or all of a Host's website. A typical system for accomplishing this task would include a data store for storing look and feel descriptions, a communication channel to the host whose look and feel is to be captured and a processor for executing the capture.

When a customer clicks on a host buying opportunity (link), the next page loaded will be a shopping page. However, this shopping page should retain the host's look and feel. This is accomplished by capturing the HTML text and images that comprise their look and feel and embed within it the shopping HTML content. Any relative URLs in the look and feel may be changed to absolute URLs back to the host system.

In a preferred embodiment, there are five steps to a process capturing the host's look and feel, converting relative URLs to absolute URLs and validation of links.

A host representative will be able to capture host look and feel information and to update host look and feel information through recapture. FIG. **6** depicts a flow chart of the pages and actions in a typical look and feel capture process. The representative has previously logged into the system to reach the host manager system page **470**. From this page, the representative selects to initiate host look and feel capture through a design storefront wizard **605**. An introduction page is presented explaining the process **610** from which the representative proceeds in the following manner:

Base URL **615**—the URL used to convert relative links to absolute links, as seen in FIG. **11**

header **620**—the HTML to be rendered BEFORE the shopping html. Selection may be made by code, as seen in FIG. **12**, by graphical point and click selection or other suitable selection method.

footer **625**—the HTML to be rendered AFTER the shopping html. Selection may be made by code, as seen in FIG. **13**, by graphical point and click selection or other suitable selection method.

preview **630**—shows what the shopping page will look like (nothing has been captured yet). From this preview page **630**, as seen in FIG. **14**, the representative may elect to return to earlier stage to change **635**, **640** or **645** of base URL, header or footer respectively. The user may also have access to a preview page **650** with example content included to demonstrate a typical page with both content and look and feel **680**, as seen in FIG. **15**. From the generic preview page **630**, the representative may choose to continue **655** with finalizing the look and feel.

final check **660**—finalize the captured look and feel, as seen in FIG. **16**, this page may allow validation of links and images and offer to save the captured look and feel. Once validation, if any has been performed, is complete and the look and feel has been saved, the process completes **675**.

14

validation **665**—validate the link and image URLs in the header and footer HTML. FIG. **17** displays the screen capture of page that could be used to display validation progress.

save **670**—Actually captures, processes and saves the storefront information. A completion page such as seen in FIG. **18** may be displayed.

For security reasons, javascript is accepted but applets are stripped out in the preferred embodiment.

Link Generator

The Link Generator allows host to create and maintain the shopping opportunities that they can then place on their site. Each Link is assigned a unique Link ID. The Link ID identifies who the host is, who the merchant is, and what commerce object (catalog, category, product or dynamic selection) is linked to.

The first time a host builds a Link to a merchant's product, category or catalog, an approval of that host for that merchant may be made. Until the host is approved, they cannot see the Link ID that has been assigned to the newly created Link.

The code the host embeds on their web site is as follows:

<!—BEGIN NEXCHANGE LINK—>

<!—For more information go to http://www.nexchange. com—>

<!—The following 2 lines MUST NOT BE CHANGED to ensure proper crediting—>

<IMG BORDER='0' SRC='http://www.nexchange.net/ img.asp?LinkID=xxxx'>

<a href='http://www.nexchange.net/ route.asp?LinkID=xxxx'>

<!—Substitute your own text or image below—>

\*\*YOUR TEXT OR IMAGE HERE\*\*</a>

<!—END NEXCHANGE LINK—>

There are several points to note here:

The image src (img.asp) is actually an ASP program that returns a single transparent pixel. This is used to track impressions (how many times the link was displayed on the host site).

The route.asp page is a page that routes the customer to the shopping page. As additional servers are added, this will become very important for load balancing.

The 'xxxx' for the LinkID='xxxx' is the Link ID assigned to the Link in the Link Generator.

A host representative will be able to generate links to commerce objects. FIG. **7** depicts a flow chart of the pages and actions in a typical link generation process. The representative has previously logged into the system to reach the host manager system page **470**. From this page, the representative selects to generate links **705**, which transfers her to a page containing a list of all previously generated links for that host **710**.

From this page, the representative may choose among several options: view an existing link **722**, remove an existing link **735**, edit an existing link **728** or add a new link to either a merchant with whom a link already exists **720** or a merchant without an existing link **715**. In viewing an existing link **722**, the page containing the link may optionally displayed in a separate window **725**; as a consequence, the representative could continue to interact with the list of available links page **710** in the primary window. The representative could select a link for removal **735** and, upon removal, return to the list of links

US 7,818,399 B1

15

page **710**. The representative may choose to edit an existing link **728** leading to a link modification page **730**. After modifying the link, the new link information would be saved **740**, and the representative would return to the list of available links **710**.

In adding a new link, a distinction may be made whether a link is made to a merchant to whom the host has previously linked **720** or to a merchant to whom a previous link does not exist **715**. In the latter case, an extra optional step may be involved to approve the host with respect to the new merchant as part of the catalog selection process **745**. In other embodiments, such a distinction need not be made. In linking to a merchant to whom a previous link does exist **720**, a catalog may implicitly be selected. In either situation, the creation process continues by allowing the representative to choose a commerce object to associate with the link **750**. Such a commerce object will be a product, a product category, a catalog or an indication that a product, product category or catalog should be chosen dynamically. From this page, the representative may go back to the catalog selection page **745** or proceed with setting link attributes **755** such as the destination upon return from the link (e.g. the point of departure into the e-commerce page or a destination designated by the representative). From this page **755**, the representative can return to the commerce object selection page **750** or continue forward with naming and saving the new link **760**. Upon completion of naming and saving page **760**, the link is saved to the system database **765**, and the representative is provided with a link to include within a page on the host website **770**. After cancellation at any time, or upon completion, the representative is returned to the list of available links page **710**.

Where a host representative chooses a dynamic indicator as the commerce object, the specific content will be chosen contextually based upon the content of the page that includes the link. In a preferred embodiment, keywords in the page are cross-reference with available catalogs, product categories and products to choose the appropriate content for the destination page associated with the link. FIG. **8** is a flow chart of the selection process in such a preferred embodiment.

A visitor is viewing the host page including a link associated with a dynamic selection commerce object **810**. The visitor activates the link. Receiving the activation, a determination is made as to whether content has previously been dynamically selected for the activated link **820**. If yes, a second determination is made as to whether the previously dynamically selected content is current **830**. If this is answered in the affirmative, a page is constructed with the previously dynamically selected content along with the look and feel associated with the host from which the link originated **840**.

If either determination is negative, the host page including the link is retrieved **850**. The page content is analyzed, and based upon the analysis, content for the link destination is selected **860**. The selected content is cached for potential future use **870**. Finally, a page is constructed with the dynamically selected content along with the look and feel associated with the host from which the link originated **840**. The analysis in **860** may take a variety of forms including, in a preferred embodiment, identification of marked keywords. In another embodiment, keywords may be dynamically determined using word count statistics.

16

In a more elaborate system, the retrieval process might encompass not only the page containing the link but also other pages linked to the page of link origin. Keywords or word count analysis could be used to determine context based upon the aggregation of pages retrieved. In a further embodiment, differing weights could be given based upon the source of the keyword identified; keywords from the page of origin would have a greater weight than keywords derived from pages one link away.

Reports

A valid host representative will have on-demand access to a report showing visits to their links and sales. The report will be scoped by date range. Visits can be summarized by merchant and by link. Sales can be summarized by merchant and by link.

As illustrated in FIG. **21**, a host representative begins at the Host Manager page **470**. She selects the view reports option **2105** to view the report menu page **2110**. From the reports menu page **2110**, she may enter criteria **2114**, **2118** leading respectively to a revenue summary page **2120** or a monthly statement page **2130**. From the monthly statement page **2130**, she may change criteria **2135** to view a revised monthly statement **2130** or return to the report menu **2110**. From the revenue summary page **2120**, she may select a specific item **2125** for receiving a detailed revenue page **2150**, alter the criteria **2127** to receive a revised revenue summary **2120**, or return to the reports menu page **2110**. From the detailed revenue page **2150**, she may return to the revenue summary page **2120**.

The following reports are available for the hosts to track their results:

Revenue Summary by Month

This report provides sales and traffic information summarized by month. Data includes number of sessions, number of orders, gross and net sales, etc. Allows 'Drill Down' to daily totals.

Revenue Summary by Merchant

This report provides sales and traffic information summarized by merchant. Data includes number of sessions, number of orders, gross and net sales, etc.

Revenue Summary by Link

This report provides sales and traffic information summarized by Link. Data includes number of sessions, number of orders, gross and net sales, etc.

3. Shopping

The shopping module is the part of the application that allows customers to find, search, select and buy a product. There is also a return product section accessible to the customer after the order has been placed.

Shopping is the part of the application that the general public will encounter. FIG. **19** displays a screen capture of a typical shopping page in a preferred embodiment. FIG. **22** depicts pages and procedures in a shopping process as implemented in a preferred embodiment.

The customer was on a host site and saw a link to buy something created via the Link generator **2200**. When he or she clicks on the link, he or she is taken to the shopping page parameterized with the Link ID **2210**. If an error occurs during this transition, the visitor is routed to a link error page **2205**.

A variety of generic information may be available from any shopping page within the system. Such information could include information about the e-commerce outsource provider **2222**, information about the merchant offering the cur-

US 7,818,399 B1

17                                                18

rent commerce object **2224**, information about an involved party's privacy policy **2226**, or information about an involved party's security policy **2228**.

Customers will be able to browse a merchant's catalogue and place items in their shopping cart **2212**. When the customer is ready to checkout **2260**, the system will acquire payment information **2262** and shipping information **2264** from the user, confirm this information **2266**, and execute the transaction. The receipt including a URL that can be used to track the order status (e.g. —it could be bookmarked) will be displayed to the customer **2268**. By visiting the URL provided upon checkout from the shopping experience, the customer can check the status of their order, initiate returns, and check on their return status.

This module contains the following submodules:

Session

Each time a new shopping session is started, a customer session is created for the shopper. This Customer Session is assigned a Session ID (SID). All pages within the shopping system must request the SID and call the ValidateSessionID function. At any time if a session error occurs, a session error page **2215** may be presented.

Unlike the merchant and host sessions, the shopping session is persistent. The session information retained is what the customer has placed in the cart and if they have checked out. The SID is also written back to the customers browser as a cookie. If a customer returns to the Shopping page an attempt will be made to use the last session they had. It will only be reused if the ALL of the following are true:

The host the customer is coming from now is the same host as in the previous session

The merchant for the current link is the same as the merchant in the previous session

The previous session was not "Checked Out"

The session is not older than a certain age.

Product Search and Selection

The main shopping page begins at the entry point that the host used to build the Link. This can be to a specific product, a category of products, a category of sub-categories, a complete catalog or a dynamically selected destination. However, no matter what entry point was chosen, the customer can navigate to every item contained in the merchant catalog used for the Link serving as the customer's entry point to the shopping. The customer may browse the catalog **2230** or search for a specific product or product category **2240**.

Shopping Cart

The Shopping Cart is the main information saved in a customer session. As a customer places products in the shopping cart, we retain information such as:

name of the product

price of the product

any attributes (size, color, etc)

host commission rate

merchant revenue percent

This information must be stored redundantly in the shopping cart because the price, name, etc may change later and the values at the time of purchase need to be retained. The shopping cart interface also allows the shopper to remove a product and/or change the quantity through a view shopping cart page **2250**.

Check Out

The check out process is separated into two distinct pieces.

Order Capture

Credit Validation

Order capture is the process of obtaining the customers billing and shipping information and creating a pending order. The credit card information is checked to make sure it is a valid number for the card type but it is not actually processed with a credit card authorization service (i.e. CyberCash). The order is accepted, assigned an order id and the customer is given an on screen and email confirmation. The pending order has a status of new.

The credit validation process happens sometime after the order capture has occurred. The customer's billing information is sent to the authorization service. The pending order now has the status of authorized.

If the card is validated, the order is accepted and placed into the TheOrder table. The pending order has a status of accepted. If the billing information fails validation, the pending order status is set to rejected and an email is sent to the customer informing that the credit card information could not be validated.

4. System Manager

The System Manager is the "Control Center" for administrators. The administrator can monitor the day-to-day activities and status of the system. When an administrator logs in, he or she is taken directly to the System Manager and assigned a Nexchange Session ID (NexchangeSID). All pages within the System Manager system must request the NexchangeSID and call the ValidateNexchangeSessionID function. If the session does not validate, the user is taken back to the Login screen. Access to administration functions will require authentication using the name and password for a valid administration account.

The home/main page of the System Manager provides a quick summary of the current system status; a screen capture of a typical main page in a preferred embodiment is seen in FIG. **20**. This summary includes pending orders, orders, host statistics, merchant statistics and an unattended orders list.

An administrator will be able to configure a hosts or merchant's payment policy. This includes specifications for any holdbacks, and a method for calculating commission/payment. At the request of a merchant, an administrator will be able to configure the system to reject all shopping traffic from a particular host-merchant arrangement. The host and merchant contacts will be notified via email. An administrator will also be able to activate or deactivate a host. The system will reject shopping traffic from inactive hosts. When a host's status is changed, the host contact will be notified via email. An administrator will configure the system to enforce system-wide policies. System-wide policies include the number of days allowed for returns.

The system will periodically run an audit process and report on situations of concern. For example, an audit could search for orders that have not been serviced for a certain period of time. The system may also report on possible security situations such as an inordinate number of account lock-out incidents.

This module contains the following submodules:

Utilities

The following utilities are available:

List Pending Orders

List Orders

List Rejected Orders

List Returns

Host

The following actions are available:

List Promos

List Hosts

Maintain Host Tiers

Host with Pending Merchants

Merchant

The following actions are available:

List Merchants

Copy a Category

Find Category Links

Add a New Merchant

Maintain Brands

US 7,818,399 B1

**19**

Application Server Tier

The business functionality is provided via "application servers". An application server will consist of one or more of the business modules, wrapped with an appropriate middleware adapter. This arrangement allows delivery of services via many different mechanisms. For example, if it becomes desirable to serve some functions to a Java client, a Java Remote Method Invocation (RMI) version of an application server could be built. The new server could be developed rapidly because only an RMI "wrapper" would need to be developed, while the application logic would be reused. In a preferred embodiment, this layer consists of a set of core C++ software modules that encapsulate business functions.

The Application Server tier may run on one or more application server computers. The application servers are stateless. This means that, for two application servers serving the same functionality, "one is as good as another". In the event of failure, a client's requests may be handled by a different server than before the failure. Since it does not matter which server services a request, routing is greatly simplified. The stateless server approach also provides excellent fault tolerance since all application servers can back each other up. Use of a combination of "sticky routing" and caching to significantly ameliorate any detrimental performance implications of the stateless approach, while preserving most of the benefit. Once a client begins using a particular service, the system will show a preference for routing future requests from that client to the same server. The servers maintain a cache recently used data and will only access the database if the desired item cannot be used in cache. Since the routing is sticky, the client's data will often be in cache, and in many cases, no database access will be required. Should the client be routed to a new server, the session data can be retrieved from the database as occurs in the "vanilla" stateless model. In a preferred embodiment, the functionality of this layer utilizes one or more low cost server systems **125a-125d** running a suitable operating system such as Microsoft Windows NT. This tier is also composed of several software layers as illustrated in FIG. **3**:

Remote Procedure Call Server **310**. This software provides connectivity to the Web Server layer and is not application dependent. In a preferred embodiment, this software layer is the Objectstore Component Server.

Application Logic **320**. This software encapsulates the business functionality. The design of this software layer and the various application servers is more fully described below.

Virtual Database **330**. The virtual database layer allows the application data to be distributed across multiple Database servers while insulating the application layer from the physical storage configuration. The virtual database contains a table that maps object types to physical databases. All database objects or records of a given type are distributed across the permissible databases. Databases can be added while the system is live to permit expansion onto new servers. Overburdened databases can be closed to prevent assignment of new data to them. Databases can be moved to different physical servers. All stored objects are referenced by a handle which is unaffected by the physical location of the referenced data. The virtual database layer also permits a collection of objects distributed across multiple servers to be indexed and searched.

DBMS Client **340**. This software provides access to data stored in the databases. In a preferred embodiment, the DBMS client is Object Design's Objectstore client. All Objectstore clients contain a cache of recently used data-

**20**

base pages. An optimistic locking scheme is used to ensure cache consistency. The caching scheme is very effective in the present invention because it is optimized for many readers and few writers.

In a preferred embodiment, the application server layer includes the following eight application servers:

1. Cashier—Collects Checkout Information: Billing Info, Shipping Preferences, Etc.

The Cashier server is analogous to a cashier in a "bricks and mortar" store. The cashier's responsibilities are listed below:

Collecting Information Necessary To Complete a Sale. This information will include billing information, shipping address(s) and preferred shipping methods. In some cases, the information to be collected may depend on the contents of the order. The cashier will also access the appropriate merchant policy information to assist in determining what data should be collected.

Providing an Itemized Account of the Total. Upon receiving the necessary data, the cashier will compute the applicable taxes, shipping charges, etc, and provide an itemized account of the order total.

Execute the Sale. Upon request, the cashier will execute the sale. A copy of the relevant information will be sent to the credit processor. When the credit processor approves the orders, the cashier will break the customer's order into individual merchant orders and forward them to the Merchants' Order Tracking server. The cashier will also post a record to the Ledger at this time.

2. Catalog—Houses Product Hierarchies. Conducts Product Searches.

The catalog is an arrangement of product information. The catalog server supports a hierarchical browsing mode and various searching functions. Its responsibilities are listed below:

Retrieve a catalog upon request. The catalog will include all content for a shopping experience. For products, the information will include the product description, price and options.

Retrieve a list of products matching a query. This will initially support simple keyword searching, but may be expanded to more sophisticated searching techniques.

3. Credit Processor—Conducts Card Validation and Fraud Screening.

The credit processor takes a candidate order and performs card authorization and fraud screening. The card processor cooperates with the order tracker to keep the status of the order updated.

Perform Credit Card Authorization. Contact the card processing vendor and authorize the card. Retrieve the Address Verification System (AVS) code for to use in fraud screening.

Perform Fraud Screening. The system performs a fraud screening analysis based on the following factors: dollar amount of the order, AVS code, whether the billing and shipping address match, and whether the email address given is a free e-mail account.

4. Notifier—Sends Messages.

The Notifier keeps track of who wants to be notified of what and how they should be notified. The notifier receives notification of various system events and takes the appropriate course of action. The appropriate course of action will depend upon the event and the party to be notified. For example, a merchant that does a high volume of sales and is

US 7,818,399 B1

**21**

already integrated with the system may not wish to receive email notification of every order.

5. Ledger—Records and Reports on all Financial Events.

The Ledger is a record of all financial events. The ledger contains interfaces for posting events and interfaces querying and inspecting the ledger. Responsibilities include:

Post an Order Event. The order event happens when the shopper confirms an order.

Post a Sale Event. The sale event occurs when a merchant marks the last item in an order shipped.

Post an Return Merchandise Authorization (RMA) Open Event/Post an RMA Completed Event/Post an RMA Canceled Event

Post a Journal Entry. This interface will be used to record non-standard events. The posted ledger entries must collectively have an equal number of debits and credits.

6. Order Tracker—Records and Reports on Order Status.

This is the repository of order information. The order tracker includes a cashier's interface for creating a new order, a Merchant's interface for keeping the order status updated, and a Customer Service interface for checking on the status of the order and making relevant annotations.

Query Order Status. This method is used by purchaser to check on the status of a pending order.

Ship Order. This method is used by a merchant to document the parceling of an order into shipments.

7. Shopping Cart—Holds Products that have been Selected for Purchase.

The shopping cart is simply a collection of Inventory Reservation documents that represent the items that have been selected by the shopper. The shopping cart includes methods for adding and removing Inventory Reservations and for inspecting the contents of the cart.

8. Warehouse—Inventory Availability Information. Product Configuration Interfaces.

The Warehouse represents a collection of physical items that are in stock. Responsibilities of the Warehouse are listed below:

Provide Information on Stock Levels of a Particular Item/ Order Items Having Low Inventory Levels. This is an advanced capability by which inventory may be dynamically reserved from a merchant, based on the current inventory levels.

Provide Information on Product Configuration Options. The warehouse will provide a blank Inventory Reservation document that will specify all of the product's configuration options.

Issue Reservations Against Inventory. A shopper will fill out an Inventory Reservation (which includes all configuration options) and submit it to the warehouse. If the item, as configured, is available, the reservation will be issued. This will serve to reserve the inventory for a fixed period of time.

Database Server Tier

Finally, the Database server tier is composed of a single software layer. This layer is responsible for low level manipulation of the data in the one or more databases. This tier may consist of multiple database servers. Using multiple servers is a major advantage for obvious reasons. The system's database chores can be distributed to many different servers. In a preferred embodiment, the database server is Object Design's Objectstore server. Objectstore supports a "warm failover" mode which allows a backup server to take over automatically if the primary should fail. An Microsoft SQL server is also

**22**

used in the preferred embodiment to maintain financial records although properly configured another DBMS such as Objectstore or a commercially available accounting package could provide capability suitable for financial record keeping.

The foregoing discussion describes the primary actors interacting with a system according to the present invention. After identifying these actors, typical transaction flows through the system are presented.

There are three main parties in the outsourced e-commerce relationship, excluding the end consumer. These parties include Merchants, Hosts, and the e-commerce outsource provider. This folds into two parties where one party plays the dual role of Host and Merchant.

Merchants

Merchants are the producers, distributors, or resellers of the goods to be sold through the outsource provider. The primary responsibilities of a Merchant are to:

Maintain an up-to-date catalog within the system including all products that are available for sale in storefronts served by the outsource provider

Create approval standards for passively recruited Host applicants based upon website profiles and target audience characteristics

Fulfill all orders received from the e-commerce outsource provider

Provide assistance to outsource provider regarding promotional strategies. This can be accomplished by supplying marketing literature and materials, as well as any sales incentives. The Merchant owns the marketing literature and materials, and may access and modify these items as necessary.

Provide service and support to customers generated via the outsource e-commerce provider

Maintain internal records of orders filled through the outsource provider and process payments from the outsource provider for these orders

Inform the e-commerce outsource provider of any backlogs, fulfillment delays, product changes, or other significant situations

Hosts

A Host is the operator of a website that engages in Internet commerce by incorporating one or more link to the e-commerce outsource provider into its web content. The responsibilities of a Host are to:

Use the outsource provider Host Manager service bureau to select the Merchants and products that will be offered from the Host's website

Promote transactions through the e-commerce outsource provider hosted by the website

Regularly review the Merchant offerings for which they have been approved in order to take advantage of new products and to review sales and promotional strategies made available to them by the Merchant

E-Commerce Outsource Provider

The role of outsource provider is to:

Develop and maintain the outsource provider service bureau—the systems and software which provide the platform for e-commerce support services

Identify and recruit target Host websites and monitor/manage these relationships

US 7,818,399 B1

23

Create customer-transparent Host processing "pages" on a secure server to receive order and payment information

Create, maintain, and update the "look & feel capture" process through which consumers are able to shop in a Merchant-controlled storefront within the design and navigational context of the Host website, preserving the ownership of the visit experience by the Host

Authorize credit card transactions (in most cases)

Process credit card payments for orders received (in most cases)

Pay periodic commissions to Hosts for orders shipped during a prior period

Transmit orders to Merchants

Pay Merchants for orders filled

Manage the commission structure for Merchant-Host relationships to maximize sales and revenues

Screen and approve Host applications

Support and monitor the merchandise return/refund process and other customer service functions

This following describes the order entry and settlement process from the initial promotion on a Host website all the way through to fulfillment, payment processing, commission payment, and Merchant payment.

Order Placement, Fulfillment, and Settlement Overview

The overall transaction process is very straightforward. The following is a list of the steps involved in receiving and processing an order request.

a) A customer visits a Host website and, through contextually relevant content, becomes interested in a product offered.

b) The customer selects the item(s) that she wishes to purchase by clicking a product image, banner-style link, or text link, or other offer format taking her to a dynamically generated web pages which retain the look and feel of the referring Host and are served by the e-commerce outsource provider.

c) The customer browses through the products offered, indicating which items are to be purchased and in what quantities via forms on-screen. Selected items appear within the shopping cart at the top of the shopping interface. The user remains on the product screen without ever being involuntarily removed to a detailed shopping cart-only screen, representing a significant enhancement over most shopping cart technology in place today. When all desired products are selected, the customer initiates the checkout procedure, never leaving the Host website.

d) The secure checkout interface appears, still consistent in look and feel with the Host's referring website. The customer completes the order form, provides all billing and shipping information required, confirms the items selected for purchase, and remits credit card information for payment processing.

e) Assuming the payment method is authorized, the customer is returned to another section of the Host's website, possibly just returning to the page in which the offer was placed, as determined by the Host.

f) The e-commerce outsource provider passes the order to the Merchant in real time. The credit card may be charged at this point or upon confirmation of shipment.

g) The Merchant receives and logs the order.

h) The Merchant then assembles and ships the order to the customer, keeping the outsource provider apprised of the order status.

i) Periodically, the outsource provider will remit payment to the Merchant for that period's filled orders.

j) Periodically, the outsource provider will remit payment to Hosts for all commissions earned in the prior period.

24

Host Process Flow

The process flow for a prospect to become a Host and be fully able to endorse/promote/offer Merchant products is as follows:

a) Hosts are recruited from three sources: direct recruiting, in which the Host prospect is identified by and approached by an e-commerce outsource provider representative; passive recruiting, in which the Host has been referred to the outsource provider by other Hosts, relevant meta-sites (sites that contain lists of and links to other sites/services), or other sources; and Host Agent recruits, in which a specialized third party Agent identifies and approaches Host prospects. In many cases, the use of online signup forms and brochures may be a factor in recruitment.

b) Prospect completes the Host application form (except where preapproved), providing information about the type of website(s) operated by the Host, some traffic statistics about these websites and general visitor demographics, and complete contact information. The prospect also selects an outsource provider system user ID and password which will later be used to access the system, retrieve important Hosting information and programming, and modify the custom materials in the outsource provider transaction processing engine.

c) The application is received and the information therein is reviewed, and the application is either approved or rejected (unless this is a preapproved Host). If approved, the Host's ID and password are activated, and an automated message is sent to the new Host informing them of their approval. This message will also contain instructions for accessing the e-commerce outsource provider system, setting up their links to the outsource provider, and inserting outsource provider data into their website(s). Preapproved Hosts will be immediately able to access this system upon submission of their application.

d) Host accesses e-commerce outsource provider system to begin the step-by-step setup process. The Host first identifies a page from their own website which will provide the look and feel to be replicated. Following this, the Host configures product selections for each of its approved Merchants and downloads product images, text, and CGI/HTML code for their own website. Host then completes changes to website and activates new content. Hosts are free to promote their use of the outsource provider as they feel is suitable to the product at any time and with any frequency, subject to reasonable limitations.

e) Hosts will be able to access real-time reports about transaction volume including number of users, average purchase amount per user, number of purchases on specified days or within specified date ranges. Hosts can create customized reports to determine conversion rates, top selling products, commissions earned, paid, and due, and other pertinent information. This information can be leveraged by the e-commerce outsource provider and the Host to improve the efficacy of targeted marketing efforts on the Host's website.

Internal System Transaction Flow

The e-commerce outsource provider system acts as a clearinghouse for all orders. The system maintains a real-time interface with a credit card authorization and processing service and a robust database engine which is able to process transactions, record all transaction activities, generate reports used for commission payments and auditing of Merchant invoices, and track order status. The transaction flow for the outsource provider service bureau is directly related to the structure of the underlying database.

US 7,818,399 B1

25

This flow can be described as follows:

a) Customer, visiting Host, activates link to commerce object within context of Host's website. This activation is typically accomplished by clicking on a hyperlink of some kind within a webpage of the Host's website.

b) The e-commerce outsource provider launches new storefront featuring specific products or product category for Merchant, as determined by Host, with the look and feel of the Host's site. The user is not made aware of the fact that this shopping experience is taking place on an outsourced server.

c) As customer browses through featured items in the Merchant's catalog, the outsource provider serves additional pages while maintaining the look and feel of the Host. The system maintains a dynamic record of customers activities including products reviewed, items selected for purchase (placed into shopping cart), and time spent shopping. The e-commerce outsource provider uses a highly reliable and accurate tracking technology throughout the shopping experience.

d) Upon checkout, the system processes customer billing, shipping, and order information via secure (encrypted) data transmission (unless the consumer opts for non-encrypted transmission). This process includes an order confirmation process and a process by which a non-approved credit card transaction may be corrected and resubmitted.

e) Upon approval, the outsource provider performs several simultaneous functions:

Thank you screen is displayed to customer

Customer is prompted to "continue" browsing Host's website.

E-mail confirmation is sent to customer detailing order information, fulfillment process, customer service terms and procedures, and other relevant information.

Order is transmitted to the Merchant electronically, via e-mail or direct link to order entry system.

Order is logged into transaction database and logged by system in conjunction with Host referral information.

Host is notified that a sale has been made and commission dollars have been earned.

The second part of the e-commerce outsource provider service bureau transaction process pertains to reconciliation and settlement with the Merchants.

a) Orders are transmitted to each Merchant as received and are logged into the system for future reference and reporting.

b) Periodically, the outsource provider will pay each Merchant for orders processed during the prior period. Payment will be driven by shipped orders as recorded within the system. Merchants can view their accumulated sales within the system at any time during the period, and historical information will be available as well.

The final part of the e-commerce outsource provider Service Bureau transaction process pertains to the payment of commissions to Hosts.

c) Periodically, the e-commerce outsource provider will calculate the accumulated commissions due to each Host from the prior period's results. Hosts will be able to review their earnings on a real-time basis at any point during a period.

d) The outsource provider will then pay each Host the appropriate commission amount via electronic payment or check along with a copy of the transactions and total report for the period being settled.

Merchant Transaction Flow

Each Merchant will be required to fulfill every order received through the e-commerce outsource provider within a designated time frame. Merchants must also be able to track

26

certain information regularly and accurately. Merchants will be monitored to ensure timely fulfillment in order to provide the best quality customer service.

The steps of the Merchants transaction flow after they have been established within the system are as follows:

a) The designated recipient of orders within the Merchant organization will check for new orders at least on a daily basis, if not more frequently. Orders are received by the Merchant via e-mail or other electronic notification, including automated direct input to legacy order management systems owned or operated by the Merchant. These orders include all pertinent customer data required for fulfillment of each order. Merchants may also view all orders online, sorted by date, status (new/viewed), or other criteria, and download orders in bulk form directly from the outsource provider.

b) After receiving the order, the Merchant will ship the order to the Customer within a reasonable time period for the type of merchandise ordered. Merchant will have the ability to modify the shipping status of the orders within the system. Merchants are obligated to provide timely shipping of their products. If any item ordered is out of stock or discontinued, the Merchant must update their catalog on the e-commerce outsource provider immediately and notify any affected customers immediately via e-mail or regular mail. Orders should be processed according to whatever internal process flow has been established by the Merchant.

c) Upon receipt of payment for the prior month's orders, the Merchant is responsible for reconciling the amount remitted with their own fulfillment records. Any disputes should be addressed by accessing the Merchant interface and querying/updating records.

The embodiments described above are given as illustrative examples only. It will be readily appreciated that many deviations may be made from the specific embodiment disclosed in this specification without departing from the invention. Accordingly, the scope of the invention is to be determined by the claims below rather than being limited to the specifically described embodiment above.

The invention claimed is:

1. A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:

(a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has been activated;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other;

(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then

(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:

(i) information associated with the commerce object associated with the link that has been activated, and

US 7,818,399 B1

27

(ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

**2**. The method of claim **1** wherein the commerce object associated with the link that has been activated is a dynamic selection indicator.

**3**. The method of claim **1** wherein at least one of the plurality of visually perceptible elements includes a set of navigational links on the source page.

**4**. The method of claim **1** wherein at least one of the plurality of visually perceptible elements includes the appearance of the top and left side of the source page.

**5**. The method of claim **1** wherein at least one of the plurality of visually perceptible elements includes the appearance of the header and footer of the source page.

**6**. The method of claim **1** wherein at least one of the plurality of visually perceptible elements includes a logo associated with the owner of the source page.

**7**. The method of claim **1** wherein the commerce object associated with the link that has been activated comprises information defining an electronic catalog having a multitude of merchant offerings, and wherein the second web page contains one or more selectable navigation links connecting a hierarchical set of additional second web pages, each pertaining to a subset of the offerings in the catalog.

**8**. The method of claim **1** wherein the second web page is generated dynamically.

**9**. The method of claim **1** wherein the owner of the source page is party to a contract providing for receipt of a commission as a result of a transaction involving the commerce object displayed on the source page.

**10**. The method of claim **9** further comprising computer-facilitating automatic payment to the owner of the source page, once the transaction is completed.

**11**. The method of claim **1**, wherein the second web page appears to the computer user to be generated by a server associated with the source page.

**12**. The method of claim **1**, wherein the link activated by the web browser is stored in a database associated with the source page.

**13**. The method of claim **1**, wherein the second web page contains a further link associated with the information associated with the commerce object associated with the link that has been activated, which link, when activated by the web browser, places data representing the commerce object into a virtual shopping cart.

**14**. The method of claim **13**, wherein the second web page contains a checkout link which, when activated by the web browser, facilitates completion of a transaction associated with the commerce object in the shopping cart.

**15**. The method of claim **14**, further comprising after the transaction is completed, computer-facilitating payment from the computer user to the merchant associated with the activated link.

**16**. The method of claim **14**, further comprising after the transaction is completed, computer-facilitating payment of a commission to the owner of the source page.

**17**. The method of claim **13**, further comprising displaying the second web page again, after the commerce object is placed into the shopping cart.

**18**. The method of claim **1**, wherein the visually perceptible elements displayed on the second web page are retrieved from a database storing data associated with visually perceptible elements for each of the first web pages.

**19**. A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

28

(a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;

(b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:

(i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;

(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.

**20**. A computer-readable memory adapted for use by an outsource provider in serving web pages offering commercial opportunities, the computer-readable memory used to direct a computer of the outsource provider to perform the steps of:

(a) in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, automatically recognizing as the source page the one of the first web pages on which the link has been activated;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants;

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one another;

(b) automatically retrieving from a storage coupled to the computer of the outsource provider pre-stored data associated with the source page; and then

(c) automatically computer-generating and transmitting to the web browser a second web page that includes:

(i) information associated with the commerce object associated with the link that has been activated, and

(ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

**21**. The computer-readable memory of claim **20** wherein the commerce object associated with the link that has been activated is a dynamic selection indicator.

**22**. The computer-readable memory of claim **20** wherein the commerce object associated with the link that has been activated comprises information defining an electronic catalog having a multitude of merchant offerings, and wherein the

US 7,818,399 B1

29

second web page contains one or more selectable navigation links connecting a hierarchical set of additional second web pages, each pertaining to a subset of the offerings in the catalog.

**23**. The computer-readable memory of claim **20** wherein the computer-readable memory is used to direct the computer of the outsource provider to perform the further step of computer-facilitating automatic payment to the owner of the source page, once the transaction is completed.

**24**. The computer-readable memory of claim **20**, (i) wherein the second web page contains a further link associated with the information associated with the commerce object, which, when activated by the web browser, places data representing the commerce object into a virtual shopping cart, and a checkout link which, when activated by the web browser, facilitates completion of a transaction associated with the commerce object in the shopping cart; and (ii) wherein the computer-readable memory is used to direct the computer of the outsource provider to perform the further steps of, after the transaction is completed, computer-facilitating payment from the computer user to the merchant associated with the activated link and computer-facilitating payment of a commission to the owner of the source page.

**25**. The computer-readable memory of claim **20**, wherein the visually perceptible elements displayed on the second web page are retrieved from a database storing data associated with visually perceptible elements for each of the first web pages.

30

**26**. A computerized system for an outsource provider serving web pages offering commercial opportunities, the system comprising:

(a) means, at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, for automatically recognizing as the source page the one of the first web pages on which the link has been activated;
   (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
   (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
   (iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one another;

(c) means for automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and

(d) server means for then automatically computer-generating and transmitting to the web browser a second web page that includes:
   (i) information associated with the commerce object associated with the link that has been activated, and
   (ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

\*  \*  \*  \*  \*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 5,213 words, excluding the exempted parts, according to the word count of the word-processing system used to prepare the brief.

/s/ *Ian B. Crosby*
Ian B. Crosby